In re Cynthia R. GREVE, Debtor.

Jerry MOUNTS, Plaintiff,

v.

Cynthia R. GREVE, Defendant.

Bankruptcy No. 2–85–03037.
Adv. No. 2–85–0286.

United States Bankruptcy Court,
S.D. Ohio, E.D.

March 14, 1989.

Steve J. Edwards, Grove City, Ohio, for plaintiff.

Jeffrey A. Linsker, Richard D. Palmer, Gottfried, Palmer & Linsker, Columbus, Ohio, for defendant.

Frederick M. Luper, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, Ohio, Chapter 7 Trustee.

## OPINION AND ORDER ON DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

This adversary proceeding is before the Court on a Complaint, filed by Jerry Mounts ("Mounts") against debtor Cynthia R. Greve ("Greve"), to determine the dischargeability of a debt. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding which the Court may hear and determine. 28 U.S.C. § 157(b)(1) and (2)(I). The Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 are set forth below.

### I. *Statement of Facts*

The incident giving rise to the instant adversary proceeding occurred on September 19, 1978. The passage of more than ten years and the rapidity with which the incident occurred have blurred the memories of the four witnesses who testified at trial. Nonetheless, having observed the conduct and demeanor of the witnesses, and after examining the record as a whole, the Court finds the facts to be as follows.

On September 19, 1978, four teenaged friends—Cynthia Greve, Lisa Bradley, Eddie Holbrook and David O'Brien—drove to the Anheuser–Busch beer brewery on the north side of Columbus early in the afternoon. They toured the plant and sampled

some beer, apparently provided by Anheuser–Busch at the conclusion of the tour. After leaving the brewery, they simply drove around for a while in Bradley's 1970 Ford Torino, eventually stopping at O'Brien's parents' home on the east side of Columbus. They remained there for a short period, following which they resumed riding around in Bradley's car. With Greve driving, they entered the southern portion of Big Walnut Park. The park is located close to both Greve's and O'Brien's homes and is bisected by Livingston Avenue. They drove through the southern side of the park and next entered the park's northern section from Livingston Avenue at approximately 5:00 p.m. The entrance—which also serves as the exit—is paved and contains a gentle curve as it descends down into the park. Greve was driving Bradley's car at the time.

Ernie Watts and Mounts, boyhood friends, track teammates at Ohio State University, and high school cross-country and track coaches, had arrived at the northern section of Big Walnut Park approximately an hour earlier. Their respective teams were scheduled to compete in a triangular cross-country meet with another high school team. Mounts and Watts positioned their schools' orange plastic traffic cones as course markers while their teams warmed up and waited for the third team to arrive. When that team did not arrive in a reasonable period of time Mounts and Watts decided to start the race without them.

Moments after the race began Mounts and Watts observed Bradley's car as it entered the park and headed down the street toward the base of the hill where they were standing. Both Mounts and Watts initially thought it might be the third team that they had been waiting for. The car stopped short of where they were standing, at which time Holbrook exited the right rear seat of the car, ran and picked up a cone, and started back toward the car with the cone in hand. It was his intention to steal the cone. Greve had remained in the driver's seat with O'Brien, who was asleep, next to her in the front passenger seat. Bradley was seated in the left rear passenger seat behind Greve.

Mounts and Watts shouted for Holbrook to put down the cone. When Holbrook failed to drop the cone, they both started chasing him as he ran in the direction of the car. Holbrook jumped into the right rear seat with Mounts just a few steps behind him. Watts, who had taken a slightly different route to the car, was several steps behind Mounts. Mounts reached into the car to retrieve the cone mere seconds after Holbrook had scrambled back to his seat, all of which caused considerable commotion inside the car. Mounts momentarily secured the cone but it was quickly knocked loose by Holbrook. Mounts reached again for the cone at which time Holbrook grabbed Mounts' arm. At or about the same time, one or more of the car's occupants instructed Greve to "punch it." She immediately pressed the accelerator to the floor and sped off with Mounts dangling from the car's side. As the car sped away, Mounts, now pinioned to the side of the car, pleaded for Greve to stop or slow down. The car was not moving, or had only instantaneously begun to move, when Mounts reached for the cone.

Greve first noticed Mounts hanging from the side of the car after she had traveled 10–15 feet at full throttle. She nevertheless completed a U-turn, kept the throttle fully depressed and remained aware of Mounts' presence on the side of the car as she sped down the road and up the hill toward the Livingston Avenue exit. Her testimony, on cross-examination, depicts her state of mind as she sped away:

Q. Now, even though you saw Jerry on the car, you kept your foot on the gas and would it be fair to say, that you had no intention of stopping the car?

A. No, it wouldn't be fair to say that.

Q. You did have an intention to stop the car?

A. Not slam on my brakes.

Q. You did have an intention to slow down and stop?

A. Eventually. I wouldn't just leave him there. The whole situation was

so insane. All of these people were screaming and I pretty much I punched it. People told me to slow down. I slowed down.

Q. What I am trying to get at is after you were on the main drive and Jerry is hanging on the car, you did not slow down gently and allow him to get off the car?

A. Yes, I did.

Q. You did?

A. Eventually. I don't know how he got off the car. All I know is I barely touched the brakes. I gently touched the brakes about five feet before that curve and he got off. He was off the car. They told me to punch it again, and I punched it again.

Hearing Transcript at 140–41. As Greve headed back up the same road on which she had entered the park and was approaching a leftward bend, someone in the car yelled for her to slow down. In response, she "barely touched" the brakes approximately five feet before the curve in the road, but then "punched it" again. By touching the brakes, she had intended to slow down enough for Mounts to remove himself, safely the Court presumes, from the side of the car. Greve estimates her maximum speed in exiting the park at 35–40 mph over a 300 to 400 yard stretch of road. The court concludes that her gentle touching of the brakes did not allow the car to slow down appreciably.

Mounts eventually worked his arms loose from Holbrook's grip and clutched the front-seat headrest to prevent being thrown from the car as it traveled at an obviously high rate of speed. His feet were bouncing off the road as he was being dragged along. As the car neared the top of the hill and Livingston Avenue, a busy Columbus thoroughfare, Mounts released his grip, causing him to bounce several times on the pavement. As a result, he sustained scrapes, bruises and abrasions. The car did not slow down after he was thrown from its side but sped away down Livingston Avenue. Mounts was dangling from the side of the accelerating car for approximately 30 seconds to one minute.

Watts, who had reached the car's trunk as it sped away, believed Mounts was dead or severely injured, and was surprised when he stood up and began walking down the hill toward the originating point of the incident. Watts met Mounts halfway down the hill and assisted with his injuries. Shortly thereafter a car entered the park with Holbrook, O'Brien and another youth inside. The three youths exited their automobile and started a minor scuffle with Mounts. When Mounts struck one of the youths in defense, they apparently decided to leave the park. Mounts and Watts then asked one of the runner's parents to summon the police.

The police arrived quickly and began taking a report. Within minutes a caravan of four to five cars arrived in the park, led by the car which had dragged Mounts along the park road. It is unclear why the caravan of cars entered the park, however no further incidents occurred. Mounts received treatment for his injuries at Mt. Carmel Hospital East on an out-patient basis.

Mounts initiated civil litigation for damages against the occupants of Bradley's car in the Court of Common Pleas, Franklin County, Ohio. Judgment was entered in 1979 in plaintiff's favor and against Greve, O'Brien and Holbrook in the sum of $1,500 compensatory damages and $6,000 punitive damages, plus costs and interest. The instant proceeding is limited to the issue of dischargeability under 11 U.S.C. § 523(a)(6) pursuant to this Court's order of April 18, 1986, and the agreement of the parties.

II. *Conclusions of Law*

Greve raises two defenses. First, she claims that Mounts assumed the risk of his injuries by his conduct and is therefore barred from any recovery. Second, she claims her conduct may have been negligent or reckless, but that it was not willful and malicious within the meaning of § 523(a)(6) of the Bankruptcy Code.

Section 523(a)(6) provides:

(a) A discharge under section 727, 1141, [or 1328(b) ], 1228(a), 1228(b), or 1328(b)

of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

The leading bankruptcy commentator has stated that:

In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 *Collier on Bankruptcy,* ¶¶ 523.16, 523–117 (15th ed. 1988) (footnotes omitted).

The Sixth Circuit Court of Appeals has provided its interpretation of the terms "willful" and "malicious." In *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986), the court stated that "willful" means deliberate or intentional, citing the legislative history to section 523(a)(6). *See,* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6320; S.Rep. No. 95–989, 95th Cong.2d Sess. 79 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5865. The court said that "malicious:"

means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.

*Id.* (citations omitted). *See also, Shepard v. Darsey (In re Darsey),* 93 B.R. 299, 18 B.C.D. 804 (Bankr.M.D.Ga.1988). The Sixth Circuit, relying heavily on *In re Franklin,* 726 F.2d 606 (10th Cir.1984), has also stated that "willful" and "malicious" require the intentional doing of an act that

necessarily leads to injury. *Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.1987).

Applying the standards articulated by the Sixth Circuit in *Wheeler* and *Perkins* to the instant case, and acknowledging the inapplicability of the "reckless disregard" standard enunciated in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the Court concludes that Greve's actions in causing Mounts' injuries were "willful" as that term is defined in section 523(a)(6). Greve knew after driving 10–15 feet at full throttle that Mounts was hanging from the side of her car. Yet, she deliberately continued her U-turn and drove toward and up the hill with him in this precarious position. Clearly, her driving of the car toward the Livingston Avenue exit was a deliberate and intentional act; thus, it was willful within the parameters of section 523(a)(6).

Although Greve was blindly following the instructions of her friends, and apparently bore no ill-will or spite for Mounts, her actions were in conscious disregard for Mounts' safety and without just cause or excuse; they also necessarily led to Mounts' injury. Accordingly, her actions were malicious within the meaning of section 523(a)(6). This finding is bolstered even more by her refusal to stop or significantly slow down to allow Mounts to safely free himself from the speeding vehicle. By her admission, Greve did no more than gently or barely touch the brake as she neared a bend in the road leading out of the park with Mounts dangling from the side of her car.

Although Greve sincerely regrets her actions that day, including her unquestioned obedience of her friends' orders to "punch" the accelerator, her actions in causing injury to Mounts must be deemed willful and malicious under the law. Both Greve and Mounts were fortunate, indeed, that his injuries were not of a more severe nature. In finding Greve's debt nondischargeable, the Court has taken into consideration her youth and the totality of the circumstances that existed that day. The Court also found her testimony to be honest, for the most part, as was true of the other wit-

nesses as they each attempted to recall minute details of an event spanning mere minutes but which occurred more than a decade ago. Irrespective of her contrition, Greve's conduct must be measured against the standards set forth in section 523(a)(6) as interpreted by the Sixth Circuit Court of Appeals. By such measure, her conduct was willful and malicious.

 Greve's other defense, that Mounts assumed the risk of his injuries, is unavailing. That defense could have been, but was not, raised as a defense to *liability* in the state court proceeding. It is not a valid defense in this Court where the sole issue is Greve's willfullness and maliciousness in causing injury to Mounts. However, even if this defense could be raised in this Court in connection with the matters complained of it would fail. Mounts could not possibly have assumed, by reaching into the car to retrieve the cone, whether the car was stationary—as the Court believes—or had just begun moving, that Greve would accelerate to nearly 40 miles per hour with him hanging from the side. Nor could Mounts assume that Holbrook would grab his arms as the car sped off or that Greve would not stop the car to allow him to free himself without sustaining some injury. Accordingly, this defense is without merit.

Based upon the foregoing, the debt owing to Mounts that arises from the state court judgment in the sum of One Thousand Five Hundred Dollars ($1,500.00) compensatory damages, Six Thousand Dollars ($6,000.00) punitive damages, plus costs and interest, is hereby determined to be nondischargeable.

IT IS SO ORDERED.