**In the Matter of Kenneth B. SHADER, Debtor.**

**Jonathan GAYL, Trustee in Liquidation for Kenneth B. Shader, Plaintiff,**

v.

**Kenneth B. SHADER and Louise (Lucie) B. Shader, Defendants.**

**Bankruptcy No. 87–123.**
**Adv. No. 87–50.**

United States Bankruptcy Court, D. Delaware.

Aug. 23, 1988.

**86**

Stephen W. Spence, Wilmington, Del., for plaintiff.

Peter J. Walsh, Wilmington, Del., for defendants.

## MEMORANDUM OPINION
## AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Kenneth B. Shader (Ken) filed an individual Chapter 7 petition on April 3, 1987. An order for relief was entered May 26, 1987 against Shader China Doll, Inc. (SCD) on an involuntary petition filed May 1, 1987. Ken's principal liabilities arose out of personal guarantees on debts incurred by SCD in which he owns all of the outstanding stock.

Jonathan Gayl (Gayl), Trustee in Ken's case, filed an objection to his claimed exemptions. The objection alleged: 1) that the value of the personal property items exceeded the statutory limits under 10 *Del. C.* § 4914 and 2) that certain real property and personal property interests claimed exempt by reason of tenants by the entireties ownership were fraudulently transferred. The second ground for objection was subsequently filed as an adversary proceeding against Ken and his second wife, Louise B. Shader (Lucie). Gayl alleges that within one year of filing his petition, Ken transferred his solely owned property to himself and Lucie as tenants by the entireties with the actual intent to hinder, delay or defraud his creditors or that he received less than its reasonably equivalent value. 11 U.S.C. § 548(a)(1), (a)(2)(A), and (a)(2)(B)(i), (ii), (iii).

At the evidentiary hearing on the objection and complaint held December 10 and 14, 1987, Gayl presented expert testimony to the effect that personal property claimed as exempt had a value of $10,275. Ken accepted the expert's figures and reserved the right to file an amended schedule B–4 to select items of a value not to exceed $5,000 and surrender or redeem the balance. Thus, only the issues raised by the complaint—a reconciliation between 11 U.S. C. § 522(b)(2)(B) and § 548(a)—require resolution.

In simpler terms, the question is whether Ken is entitled to exempt property held as tenants by the entireties or did he transfer his property to the name of himself and Lucie within the year preceding his bankruptcy filing for the purpose of defrauding his creditors or for less than its value.

Ken's personal bankruptcy followed the turnover of SCD's property to Wilmington Trust Company at the end of 1986. SCD was started by Ken and his first wife Stephanie in 1978. Ken and Stephanie were divorced in September 1985. She continued to be fully active in the business until mid-January 1986 when the corporation purchased her interest for $600,000. As a part of the buyout, she was to receive monthly payments aggregating approximately $100,000 a year. These payments were made through 1986. Ken's compensation in 1986 was $6,000 bi-weekly or $156,000 per year. Wilmington Trust Company became the source of SCD's finances in February 1986 granting a term loan of $250,-000 and a $500,000 line of credit which was later increased to $750,000.

The business of SCD grew out of a doll-making hobby and had as its mainstay the Shader doll. From time to time it produced specialty dolls for other retailers. From mid–1984 until the end of 1985, it produced Cabbage Patch dolls and experienced phenomenal growth. When that market ended, SCD had a contract with the Danbury Mint and in March 1986 it started producing another specialty, the Rockettes doll. Neither project reached its anticipated level. The Danbury Mint production phased out in September and sales of the Rockettes doll, which had been averaging 20 a day with a profit margin of approximately $275 per doll, trailed off after November.

The business did not reopen after its holiday close-down.

It is SCD's failure to reopen and meet its financial obligations and Ken's personal guarantee of those obligations that bring into question other transactions that occurred in 1986 with respect to his second marriage.

In February Ken met Lucie. They became engaged in March and planned an August wedding. Ken owned a house in Hockessin which he had bought after his divorce from Stephanie. He shared with Stephanie alternate monthly custody of their three teenage children. When Lucie moved in with her two teenage children in June, it was immediately apparent that the house was inadequate. Ken and Lucie hired a real estate agent to look for a larger home and on July 11 they executed a purchase agreement for 8 Red Oak Road, Wilmington. Ken and Lucie were married August 24, 1986. They closed on the purchase of the residence taking title as tenants by the entireties on September 19, 1986.

In connection with their marriage, Ken and Lucie acquired personal property. These items fall into three categories:

1.  Four art objects purchased May 3, 1986, at a Temple Beth El auction and paid for with check # 195 drawn on Ken's account in the amount of $3,920.
2.  Cash purchases of a dining room fireplace screen and set and a living room fireplace screen and set in September 1986.
3.  Two oriental rugs and a large breakfront purchased from the seller of the real estate shortly after closing (October 26) and paid for by check # 292 drawn on Ken's account in the amount of $4,666.88.

If the items of personal property and the real estate are properly held as tenants by the entireties, that property together with the $5,000 exemption permitted under 11 U.S.C. § 522(b)(2)(A) is removed from the estate created under 11 U.S.C. § 541(a)(1). Gayl, however, contends that this property was fraudulently transferred by Ken to himself and his wife making the transfers

voidable under 11 U.S.C. § 548(a) so that the property remains as property of the bankruptcy estate.

■■■■ To determine whether the property was held as tenants by the entireties when Ken filed his bankruptcy case, we must look to state law. In Delaware, a tenancy by the entirety is recognized in both real and personal property. Since real property is invariably titled through a deed, the determination of whether it is held as tenants by the entireties is a simple matter of referring to the deed. However, the relationship of husband and wife must exist at the time of its creation as well as unity of time, title, interest and possession. 41 *Am.Jur.2d*, Husband and Wife, § 55–59, § 60; *Rigby v. Rigby*, 32 Del. Ch. 381, 88 A.2d 126 (1952). Settlement on the real estate occurred subsequent to Ken and Lucie's marriage. Thus, all elements necessary to create a tenancy by the entireties were present.

The same characteristics must exist as to items of personal property. Many personal property items, especially household goods and furnishings, are not titled on paper. As to those, the Delaware Chancery Court in *DuPont v. DuPont*, 33 Del. Ch. 571, 98 A.2d 493, 496 (1953) held:

> ... [H]ousehold goods and furnishings, even though contributed or paid for by the husband, are presumptively held jointly—by the entireties—when such property is in their joint possession and use ...
>
> If married couples desire to preserve individual title to such property, it is up to them to evidence such ownership by appropriate documents or by other evidence which can overturn the presumption of joint ownership.

■■■■ Under the rule of *DuPont*, the household goods and furnishings purchased after Ken and Lucie's marriage are entireties property regardless of the source of funds used to purchase them (categories 2 and 3, p. 5, *supra*).

■■■■ The four art objects are not entireties property. Even though Ken and Lucie may have intended to and subsequently

used them as household furnishings, the presumption of joint ownership is overcome. At the time of purchase, they were not married nor is there anything to indicate transfer of Ken's individual interest in those objects subsequent to the marriage. The marriage in and of itself cannot satisfy the necessary elements. The relationship must exist simultaneously with unity of time, title, interest and possession.

Having concluded that the real estate and all but the four art objects are entitled to entireties status under Delaware law, we must now determine whether Gayl has met his burden of proving that Ken while insolvent either transferred his individual property into entireties property with actual intent to defraud his creditors or made transfers without receiving reasonably equivalent value.

■ Gayl's burden is a difficult one. He is first faced with the basic proposition that:

Mere conversion of property from nonexempt to exempt on the eve of bankruptcy—even though the purpose is to shield the asset from creditors—is not enough to show fraud. *Ford v. Poston*, 773 F.2d 52, 54 (4th Cir.1985).

This proposition follows from the legislative history of § 522(b)(2)(B) expressing the congressional intent that a debtor is to be allowed full use of the exemption.

As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law. H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 76 (1978).

Gayl then must show either *actual* intent to defraud or that Ken received less than the value of the property he transferred.

Ken could not have transferred the specific property into entireties property because the real estate and items of personalty were purchased after and as a result of a marriage within the year preceding his bankruptcy filing. Thus, we must determine whether he intentionally converted individual assets into cash, invested the money in entireties property to avoid his individual obligations or failed to receive reasonably equivalent value for his assets. This requires an inquiry into the amount of his contribution toward the purchase of entireties property, the source of those funds and the financial condition of SCD.

■ Payment of $500,000 and settlement costs on the real estate at Red Oak Road was made through a Wilmington Trust Company mortgage loan of $250,000; a purchase money mortgage of $50,000 and contributions of Ken and Lucie from their individual funds. A $5,000 deposit required at execution of the purchase agreement in July was drawn from an account in Lucie's name. An additional $40,000 required within 10 days of its execution was drawn one-half from Lucie's account and one-half from an account in Ken's name. At closing, September 19, Ken and Lucie tendered an additional $178,056.37 from their joint Wilmington Trust account. This amount consisted of a September 17 deposit to that account by Lucie of $148,217.49; a deposit by Ken on September 18 of $23,529.51 and approximately $6,309.37 that had previously been in the account. Lucie's deposit represented the sale proceeds of her home in Livingston, New Jersey; Ken's deposit represented a salary check and $20,000 from his account at First Federal. Attributing the balance of $6,309.37 to Ken, his total contribution is $49,838.88 and Lucie's is $173,217.49.

The amount Ken spent for personal property is $8,586.88. There is no record of the actual amount paid nor who paid for the fireplace screens and sets but they were valued by Ken in his schedules at $500 and by Gayl's appraiser at $175. Assuming for our purposes here that Ken's funds were used, a round figure of $9,000 for personal property is fair.

During SCD's last year of operation, Ken used $58,838.88 of his individual assets toward the purchase of entireties property. Approximately one-third of that amount was spent before the end of July and the

major portion of the balance was spent before the end of September 1986. During this period of time, SCD was paying out of operating income its full complement of employees, Ken was receiving a substantial salary, Stephanie was being paid a substantial amount in accordance with the buyout agreement, and Wilmington Trust Company was receiving substantial sums on its line of credit: July $87,680.62; August $23,500; September $12,870. Despite the phaseout of the Danbury project at the end of September, WTC was paid $75,500 in October and $129,158.44 in November. Apparently a large portion of this last payment was funded in part by Ken's turnover to SCD in November of the net proceeds of $90,000 he received on the sale of one of the two pieces of real estate he owned going into 1986.

By the end of November, Ken was aware that the Rockettes project was winding down. However, following closing of the sale of the Hockessin property in December, he placed approximately $17,000 of the net proceeds of $40,000 into SCD. At about the same time, his concern about SCD's financial difficulties should the Rockettes project not turn around prompted him to consult with an experienced bankruptcy attorney. It was at this meeting that he first learned that in Delaware entireties property is immune from execution by the individual creditors of either tenant. Had he been aware of this, it is inconceivable that Ken, who describes himself as a "big picture man" would have poured $107,000 realized from the sale of his individual assets into SCD if he had any intent to defraud his creditors when he could have applied those funds toward reduction of the mortgages he and Lucie assumed on their residence. This payment along with SCD's history of success following previous cash crunches also supports his assertion that he intended to reopen SCD following the holiday closing.

The facts refute an intent to defraud creditors. It was Ken's family situation—a new wife, the necessity to accommodate a large family—that prompted the purchase of a larger residence and the items of per-

sonalty that went into that residence, not any calculated intent to deceive his creditors. Moreover, from the standpoint of value, Ken received considerably more value from the cash, $58,838.88, he contributed toward the entireties property than he paid. Lucie's contribution of $173,217.49 which went into entireties property is approximately three times greater than Ken's contribution. As a tenant by the entirety he holds an undivided interest in the tenancy subject only to the claims of joint creditors.

At the opening of the hearing on December 10, Gayl moved to amend the complaint to include within his § 548(a) allegation other items of personal property. The motion was denied but the court commented that at the conclusion of trial amendments to conform with the evidence would be permitted. The evidence permits the amendment.

The items are Lucie's engagement ring purchased in March or April of 1986, a washer and dryer purchased after September of '86, purchases of household furnishings from Strawbridge and Clothier totaling $3,729.33 (Ex. 18, Ck. # 221 dated December 1986 and Ck. # 308 dated February 1987), and $3,000 paid to Royal Imports for a car titled in Lucie's name.

The purchase of the washer, dryer and the items purchased from Strawbridge took place after marriage and after purchase of their residence. Gayl points to the fact that Ken made a greater number of deposits to their joint account than Lucie, but it must be noted that the amount of Lucie's deposits exceeds Ken's deposits through January 19, 1987. These facts are not relevant in light of the ruling of *DuPont v. DuPont, supra*. These items are entireties property, properly exempt and not in violation of § 548(a) for the reasons previously stated.

Lucie's unrefuted testimony is that the car is titled in her name and that the money paid to Royal Imports was her money despite the check being drawn on the joint account. This is the point addressed in the

**90**

second quoted paragraph of the *DuPont* case (see p. 87, *supra*).

The engagement ring poses a problem since Ken's petition was filed April 3, 1987 and the record is in conflict as to when Ken gave Lucie the ring. Ken states it was in March; Lucie could not remember whether it was March or April. Thus, the ring could be outside the one year preceding bankruptcy or just within the one year. They met in February and purchases for their anticipated marriage were made as early as May 3. The circumstances suggest a whirlwind courtship which belies any consideration by Ken of an expenditure made for the purpose of defrauding his creditors. Moreover, Ken received value for the ring—Lucie married him.

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, August 23, 1988, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. Debtor's exemption under 11 U.S.C. § 522(b)(2)(A) is limited to property having a value of no more than $5,000. 10 *Del.C.* § 4914.

2. Within twenty days of the date of this order, Debtor shall file with the court and serve upon the Trustee an amended Schedule B–4. The value of each item selected shall be based upon the appraisal report.

3. The Trustee's objection to the exemption of the four art objects under claim of ownership as tenants by the entireties is allowed.

4. The Trustee's objection to the exemption of the real estate and the remaining personal property identified at hearing by reason of ownership as tenants by the entireties is disallowed.

5. The relief requested in the Trustee's complaint is denied.

6. Debtor shall surrender or redeem all non-exempt personal property at its appraised value within thirty days of the date of this order or within such additional time as the Trustee may grant.