In re Richard W. BECKMAN, Nancy S. Beckman, Debtors.

Larry E. STAATS, Trustee, Plaintiff,

v.

Richard W. BECKMAN, et al., Defendants.

Bankruptcy No. 2–86–00126.
Adv. Pro. No. 2–87–0278.

United States Bankruptcy Court, S.D. Ohio, E.D.

July 26, 1989.

Larry E. Staats, Columbus, Ohio, trustee/plaintiff.

Shirley C. Hansgen, Tanner & Mathewson, London, Ohio, for Richard and Nancy Beckman.

Andrew W. Cecil, Columbus, Ohio, for Bankers Nat. Life Ins. Co.

Charles M. Caldwell, Office of U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Statement*

This matter is before the Court upon the Complaint for Money Judgment, Etc. Based on Fraudulent Transfer ("Complaint") filed by Larry E. Staats, the duly-appointed trustee in the Chapter 7 case of *In re Richard W. and Nancy S. Beckman*, Case No. 2–86–00126, ("Trustee"); the Answer thereto filed by Richard and Nancy Beckman ("Debtors"); and the parties'

joint request that this adversary proceeding be adjudicated upon stipulated facts and exhibits. Also before the Court for determination is the Trustee's Objection to Exemption Claim ("Objection") and Debtors' opposition thereto. The Objection was heard previously by the Court, but a ruling thereon was held in abeyance pending entry of a final judgment in this adversary proceeding.

Jurisdiction over this case is vested in the Court pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. This adversary proceeding is a core matter which the Court may hear and determine. 28 U.S.C. § 157(b)(1) and (2)(B). The following Opinion and Order shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

## II. *Factual Background*

The parties have submitted joint factual stipulations which are set forth below *verbatim:*

1. It is hereby stipulated and agreed that prior to September, 1985, when the Defendants, Richard and Nancy Beckman, first consulted an attorney concerning their financial situation, they believed that they collectively owned assets worth in excess of $3,000,000.00 and that their joint net worth was in excess of $1,500,-000.00. After consulting with their attorney and having their assets appraised, it became apparent during October of 1985 that they had a negative net worth, i.e., were insolvent, and that Bankruptcy was inevitable.

2. In December, 1985, and at the time of filing of the petition in Bankruptcy herein, Richard W. Beckman had the following life insurance coverage:

(a) Bankers National Life Insurance Co.
  (1) Term policy— No. 450–148 purchased in 1984 ........... $200,000.00
  (2) Term policy ... [-] No. 590–673 purchased in 1984 .......... $100,000.00

(b) Security Mutual Life Insurance Co.
  (1) Whole Life Policy, No. [unknown] purchased in [date unknown] ...... $10,000.00

(c) A group accidental life insurance policy (company, number, and date of purchase unknown) .... $100,000.00

(d) Credit Life Insurance covering the Nazarine Credit Union debt of [approximately] ............. $14,000.00

3. On December 12, 1985, Richard W. Beckman signed an application to purchase $100,000.00 worth of additional life insurance from Bankers National Life Insurance Co. On December 21, 1985, Nancy W. Beckman signed an application to purchase $100,000.00 worth of life insurance with Bankers National Life Insurance Co. Copies of the policies issued with copies of said applications being a part thereof are attached hereto and marked Exhibit .B and Exhibit C.

4. On January 11, 1986, Richard W. Beckman delivered $15,000.00 cash to an agent of Bankers National Life Insurance Co. as the initial premium on the policies intended to be issued in response to the applications referred to above, i.e., $10,000.00 on the policy to be owned by Dr. Beckman and $5,000.00 on the policy to be owned by Mrs. Beckman. A copy of said receipt is attached hereto and marked "Exhibit A".

5. The source of the funds used to pay the premiums was fees earned by Richard W. Beckman in his dentistry practice during the months of October, November, and December, 1985.

6. The Debtors signed their Chapter 7 Bankruptcy Petition on January 9, 1986, and the same was filed herein on January 14, 1986.

7. With the exception of the Credit Life insurance policies, the beneficiaries on all of the life insurance policies referred to above are either the Debtors or their children.

8. The parties further stipulate that the original petition and schedules filed hereto [sic] by Richard and Nancy Beckman may be considered by the Court as evidence herein. The parties also stipulate that the typed transcript of the "Deposition" of Richard Beckman taken on May 7, 1987, a copy of which is attached hereto and marked "Exhibit D", and the transcript of testimony of Richard Beckman, a copy of which is attached hereto and marked "Exhibit E", presented in the hearing conducted on September 1, 1987, on the Trustee's Objection to exemptions [sic] may also be considered as evidence herein.

9. The cash surrender value of the two life insurance policies in question, on the day of filing of the petition in Bankruptcy by Richard and Nancy Beckman, was as set forth in the attachment ("Exhibit F") to a letter dated October 20, 1986, addressed to Larry E. Staats, from Brian J. Cheney, Assistant Counsel for Bankers National Life Insurance Company, i.e. $9,764.87 for Dr. Beckman's policy and $4,873.45 for Mrs. Beckman's policy.

10. That the parties have entered into an agreement with Bankers National Life Insurance Co., a copy of which is attached hereto and marked "Exhibit G", and expect shortly to submit a proposed Order removing said insurance company as a party herein.

11. The above facts are hereby stiputlated [sic] to be true for purposes of this Court deciding the issues in this adversary proceedings. The documents attached hereto are hereby stipulated to be true and accurate copies of the originals and that said documents are evidence herein. The parties further stipulated [sic] and agree that the Exhibit E, which is a transcript of tesimony [sic] given by Dr. Beckman before this Court on a previous occasion contains errors in transcription which may be referred to by either of the parties in briefs to be filed hereafter.

III. *Arguments of the Parties*

Against the backdrop of the foregoing stipulated facts and exhibits the parties have asserted the legal arguments summarized below. The Trustee argues as follows:

(1) Debtors' purchase of the whole-life insurance policies (the "Insurance Purchase") from Bankers National Life Insurance Co. ("Bankers") was made with actual intent to hinder, delay and defraud the creditors of the estate; therefore, the transaction is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1);

(2) The Insurance Purchase constitutes a fraudulent conveyance under state law, specifically, Ohio Revised Code ("O.R.C.") § 1313.56, and is subject to avoidance by the Trustee under 11 U.S.C. § 544(a);

(3) Because Richard Beckman received less than reasonably equivalent value in exchange for his payment of the $5,000 premium to Bankers for Nancy Beckman's $100,000 whole-life policy (the "$5,000 Transfer"), pursuant to 11 U.S.C. § 548(a)(2), the $5,000 Transfer may be avoided; and

(4) The whole-life policies issued to Debtors by Bankers (the "Policies") are not properly exemptible under Ohio law inasmuch as the Insurance Purchase was made in fraud of Debtors' creditors within the meaning of O.R.C. § 3911.10.

Debtors respond by arguing that it was perfectly proper and, hence, not fraudulent, to convert non-exempt cash to exempt property—the Policies[1]—on the eve of bankruptcy. Further, according to Debtors, the Insurance Purchase was made merely to "provide for each other and their children in the event that one or both of them died...." Debtors' Brief at 5. For these reasons, Debtors submit that because the Insurance Purchase was not fraudulent under either federal or state law the transfer of $15,000 in cash to Bankers is not avoidable. Further, the Policies should be declared exempt, Debtors claim, since the In-

---

**1.** Debtors claim the Policies exempt under. O.R.C. §§ 2329.66(A)(6)(b) and 3911.10. These statutory provisions are set forth and discussed, *infra,* at 18–21.

surance Purchase was not made in fraud of their creditors within contemplation of O.R.C. § 3911.10.

## IV. *Legal Discussion*

### A. *Fraudulent Transfer*

The Trustee maintains the Insurance Purchase was undertaken with actual intent to hinder, delay and defraud the creditors of the estate, thereby rendering the transaction avoidable pursuant to 11 U.S.C. § 548(a)(1). This provision states:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

. . . .

11 U.S.C. § 548(a)(1). The issue for decision, then, is whether Debtor's eve-of-bankruptcy conversion of non-exempt cash into exempt life insurance policies constitutes fraudulent conduct or merely prudent pre-bankruptcy planning.

Considerable debate in the case law has been engendered by pre-bankruptcy engineering—*i.e.*, the practice of converting non-exempt property to exempt property in contemplation of filing a bankruptcy case. *Compare Hanson v. First Nat'l Bank in Brookings,* 848 F.2d 866 (8th Cir.1988) (allowing claimed exemption of property which was converted from non-exempt property shortly before bankruptcy was filed) and *Marine Midland Business Loans, Inc. v. Carey (In re Carey),* 96 B.R. 336 (Bankr.W.D.Okla.1989) (holding that extensive pre-bankruptcy planning through which debtor placed nearly $180,000 be-

yond the reach of her creditors during 21–month period immediately preceding petition date was not fraudulent) with *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988) (denying discharge to debtor who converted non-exempt property into exempt property) and *In re Summers,* 85 B.R. 121 (Bankr.D.Or.1988) (disallowing exemption on ground that eve-of-bankruptcy transfers of property from non-exempt to exempt status were fraudulent). Pre-bankruptcy planning likewise has spawned a number of scholarly articles. *See* Resnick, *Prudent Planning or Fraudulent Transfer? The Use of Non Exempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy,* 31 Rutgers L.Rev. 615 (1978); Note, *Section 522 Exemptions: A Look at the Individual Debtor's Reduction of the Bankruptcy Estate,* 5 Bankr.Dev.J. 131, 142–148 (1987); Koger and Reynolds, *Is Prefiling Engineering Prudent Planning or Section 727 Fraud? (Or, When Does a Pig Become a Hog?),* 93 Com.L.J. 465 (1988).

The general rule which has emerged from the decisional law is that mere conversion of property from non-exempt to exempt status on the eve of bankruptcy does not establish fraud. *See First Texas Savings Assoc., Inc. v. Reed (In re Reed),* 700 F.2d 986 (5th Cir.1983); *Armstrong v. Lindberg (In re Lindberg),* 735 F.2d 1087 (8th Cir.), *cert. denied sub nom. Armstrong v. Lindberg,* 469 U.S. 1073, 105 S.Ct. 566, 83 L.Ed.2d 507 (1984); *Daniel v. Security Pacific Nat'l Bank (In re Daniel),* 771 F.2d 1352 (9th Cir.1985); *Ford v. Poston (In re Ford),* 773 F.2d 52 (4th Cir. 1985); *Tveten,* 848 F.2d at 873–74; *Smiley v. First Nat'l Bank of Belleville (In re Smiley),* 864 F.2d 562 (7th Cir.1989); *Thorp Credit, Inc. of Ohio v. Saunders (In re Saunders),* 37 B.R. 766 (Bankr.N.D. Ohio 1984); *Panuska v. Johnson (In re Johnson),* 80 B.R. 953 (Bankr.D.Minn. 1987).[2] The legislative history to 11 U.S.C.

---

**2.** Many of the cases cited above involve the issue of whether a debtor's pre-bankruptcy conversion of non-exempt property to exempt property constitutes conduct intended to hinder, delay or defraud creditors so as to preclude the granting of a discharge in a Chapter 7 or 11

case. *See* 11 U.S.C. § 727(a)(2). However, because the "hinder, delay or defraud" language of 11 U.S.C. § 727(a)(2)(A) is identical to that contained in the fraudulent transfer provision—11 U.S.C. § 548(a)(1)—the analysis employed in the above cases is virtually identical to that utilized

§ 522(b)—which sets forth a debtor's available exemptions in a Chapter 7 proceeding—supports a debtor's right to exemption planning, stating:

> "As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News. 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5862. While eve-of-bankruptcy conversion of non-exempt property to exempt property alone is not fraudulent as to creditors, if extrinsic evidence of intent to defraud creditors is adduced, courts have: (1) disallowed the debtor's exemption claim; (2) held that the pre-bankruptcy transactions constitute avoidable fraudulent transfers under 11 U.S.C. § 548(a)(1); or (3) denied the debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)(A). *See Tveten,* 848 F.2d at 874; *Mueller v. Redmond (In re Mueller),* 867 F.2d 568, 570 (10th Cir.1989); *Federal Savings & Loan Ins. Corp. v. Holt (In re Holt),* 97 B.R. 997, 1000 (W.D. Ark.1988); *Samore v. Breuer (In re Breuer),* 68 B.R. 48, 51 (Bankr.N.D.Iowa 1985); *Summers,* 85 B.R. at 126; *Gayl v. Shader (In re Shader),* 90 B.R. 85, 88 (Bankr.D.Del.1988). Hence, the Court must determine here whether the Trustee has shown the existence of extrinsic evidence of fraud—*i.e.,* evidence demonstrating that the Insurance Purchase was made with the intent to hinder, delay or defraud Debtors' creditors. Proof of such fraudulent intent on Debtors' part would render the transaction avoidable under § 548(a)(1) of the Bankruptcy Code.

Among the circumstances which courts focus upon in determining a debtor's intent

---

by courts facing the present issue, *viz.,* whether pre-bankruptcy conversion of non-exempt to exempt property is fraudulent for purposes of § 548(a)(1). *See Federal Savings & Loan Ins.*

in purchasing exempt life insurance on the eve of bankruptcy are the following:

(1) whether there was fair consideration paid for the life insurance policy;

(2) whether the debtor was solvent or insolvent as a result of the transfer or whether he was insolvent at the time of the transfer;

(3) the amount of the policy;

(4) whether the debtor intended, in good faith, to provide by moderate premiums some protection to those to whom he had a duty to support;

(5) the length of time between the purchasing of a life insurance policy and the filing of the bankruptcy;

(6) the amount of non-exempt property which the debtor had after purchasing the life insurance policy;

(7) the debtor's failure to produce available evidence and to testify with significant preciseness as to the pertinent details of his activities shortly before filing the bankruptcy petition.

*Mueller,* 867 F.2d at 570; *Matter of Mehrer,* 2 B.R. 309, 312 (Bankr.E.D.Wash.1980) (decided under the Bankruptcy Act); *Peoples State Bank & Trust Co. v. Sayler (In re Sayler),* 68 B.R. 111, 121 (Bankr.D.Kan. 1986), *rev'd on other grounds,* 98 B.R. 536 (D.Kan.1987); *Summers,* 85 B.R. at 126.

■ Utilizing the foregoing factors as a guide, the Court concludes that in carrying out the Insurance Purchase the Debtors intended to defraud their creditors. The factors delineated in paragraphs (2), (5) and (6) of the above list are clearly present here. Debtors converted all of their remaining non-exempt property (¶ 6) two days before their bankruptcy petition was filed (¶ 5) and while they were admittedly insolvent (¶ 2). While the presence of these three factors is significant, they do not, standing alone, establish extrinsic evidence of fraud. Indeed, such factors will be present in virtually every instance where pre-bankruptcy planning is undertaken.

---

*Corp. v. Holt (In re Holt),* 97 B.R. 997 (W.D.Ark. 1988); *Samore v. Breuer (In re Breuer),* 68 B.R. 48 (Bankr.N.D. Iowa 1985); and *Gayl v. Shader (In re Shader),* 90 B.R. 85 (Bankr.D.Del.1988).

Here, however, there is further, compelling extrinsic evidence of fraud.

The amount of insurance purchased by Debtors (¶ 5) likewise evinces a fraudulent purpose on their part. Richard Beckman maintained $300,000 in term life insurance; $100,000 in accidental life insurance; $10,000 in whole life insurance; and $14,000 in credit life insurance at the time the Policies were purchased. Yet, notwithstanding such a substantial amount of life insurance coverage, debtors consummated the Insurance Purchase a mere three days prior to their bankruptcy filing. Debtors maintain this additional protection was necessary for the security of their family. But, having considered the record as a whole, including Richard Beckman's courtroom demeanor, the Court concludes that his testimony is simply not credible. To purchase an additional $200,000 in life insurance on the eve of bankruptcy and pre-pay the premiums thereon so that the cash surrender value of the Policies would be obtainable by Debtors upon termination of their bankruptcy proceeding goes far beyond "[providing] in good faith ... by moderate premiums some protection to those to whom ... [Debtors] had a duty to support." *Mehrer,* 2 B.R. at 312; *Summers,* 85 B.R. at 126.

Perhaps the most telling indicator of Debtors' fraudulent intent is their attempted concealment or, at best, obfuscation of the Insurance Purchase in their bankruptcy petition and accompanying schedules. Where pre-bankruptcy planning is accompanied by concealment or conduct calculated to mislead creditors, fraudulent intent will be inferred. *See Reed,* 700 F.2d at 991–92; *McCormick v. Security Bank,* 822 F.2d 806, 808 (8th Cir.1987). That Debtors engaged in such deceptive conduct by failing to disclose fully their ownership interest in the Policies is readily apparent from a review of their bankruptcy schedules. At the time Debtors signed the schedules, they possessed $15,000 in undisclosed cash. Between the date the petition was signed and its filing date, Debtors transferred the $15,000 in payment of the Policies. While Debtors' nondisclosure of the $15,000 is susceptible to explanation—

given their knowledge that this sum would be paid Bankers prior to the petition date—Debtors' concomitant failure to disclose accurately the existence of the Policies manifests an intent to mislead their creditors.

The schedules contemplate disclosure of interests in insurance policies in two places: (1) on line B–2/r of the "Summary of debts and property" schedule, which is captioned "Interests in insurance policies"; and (2) on line R of the schedule of Personal Property (B–2), which also is entitled "Interests in insurance policies." Yet, Debtors' only references in the schedules to their ownership of the Policies are oblique ones. Debtors completely omitted the Policies from the "Summary of debts and property" schedule. *See* Appendix "A". Debtors did include the phrase "life insurance policies" within their schedule of personal property (Schedule B–2). But, the manner of disclosure again suggests an attempt to conceal or obscure their ownership of the Policies. Debtors did not list the Policies in the correct place—on line R of Schedule B–2. Rather, reference to the Policies was made on line P under the heading "Other liquidated debts owing debtor." *See* Appendix "B". Significantly, while line R of Schedule B–2 specifically directed Debtors to "itemize, surrender or refund values of each [policy]," Debtors failed to disclose the cash surrender value of the Policies.

To summarize, a review of Debtors' schedules in their entirety reveals a woefully incomplete disclosure of the nature of Debtors' property interest in the Policies. Viewed positively, Debtors' nondisclosures evidence a reckless disregard for the accuracy and completeness of their bankruptcy schedules. Viewed more dimly, this lack of disclosure constitutes deliberate concealment of their ownership of the Policies. In any event, the schedules filed by Debtors are materially omissive and suggest Debtors intended to mislead their creditors with respect to their prepetition conversion of the non-exempt $15,000 in cash to the exempt Policies.

In sum, based upon the totality of the facts and circumstances presented in this case, and particularly Debtors' failure to

disclose fully and accurately the Policies in their schedules, the Court concludes that the Trustee has demonstrated the existence of fraudulent intent on Debtors' part. Accordingly, the Insurance Purchase is subject to avoidance pursuant to 11 U.S.C. § 548(a)(1).

As stated above, the Trustee also asserts that he may utilize the "strong-arm" powers granted by 11 U.S.C. § 544(a) to avoid the Insurance Purchase under Ohio law. Specifically, the Trustee submits that the Insurance Purchase constitutes a fraudulent conveyance as defined in O.R.C. § 1313.56. Having ruled that the Insurance Purchase is an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1), it is unnecessary for the Court to address the Trustee's alternative argument—i.e., that the Insurance Purchase also is subject to avoidance under § 544(a) of the Bankruptcy Code.

### B. *The $5,000 Transfer*

■ Having determined that the Insurance Purchase is an avoidable fraudulent transfer the Court need not dwell at length on the Trustee's contention that a component thereof—the $5,000 Transfer—is subject to avoidance on an alternative ground. According to the Trustee, because Richard Beckman received no consideration from Nancy Beckman in exchange for his purchase of a $100,000 whole-life policy for her,[3] the $5,000 may be avoided pursuant to 11 U.S.C. § 548(a)(2).[4] The $5,000

Transfer is not avoidable under § 548(a)(2), Debtors submit, because Bankers—the recipient of the $5,000 Transfer—received full and fair consideration in exchange for its issuance of the $100,000 whole-life policy to Nancy Beckman. As is demonstrated below, Debtors' interpretation of § 548(a)(2) is both facile and erroneous. Richard Beckman's failure to receive equivalent value from his spouse in exchange for the purchase of her policy renders the $5,000 Transfer avoidable under § 548(a)(2) of the Code.

The Trustee's position can be best articulated in two stages. First, while Bankers was the direct transferee of $5,000 from Richard Beckman, the Trustee argues, Nancy Beckman was the actual beneficial recipient—i.e., she became the owner[5] of a $100,000 whole-life policy having a cash surrender value of $4,873.45 as of the petition date. Trustee's Brief at 2–4. From this starting point, the Trustee reasons that Richard Beckman's failure to receive consideration from his wife in exchange for the purchase of her policy allows for avoidance of the $5,000 Transfer. *Id.* As shown below, the Trustee's argument is meritorious.

Three-sided transactions, such as that presented here, create special difficulties in determining "reasonably equivalent value" for purposes of § 548(a)(2). As a general rule, "[i]t may be said that . . . an insolvent debtor receives 'less than a reasonable

---

**3.** The evidence establishes that the funds utilized to purchase Nancy Beckman's policy were derived from Richard Beckman's dental practice. Ohio law explicitly leaves property rights unaltered by the fact of marriage: "Neither husband nor wife has any interest in the other, except [implicit in the duty to support], the right to dower, and the right to remain in the mansion house after the death of either." *Butz v. Wheeler (Matter of Wheeler)*, 17 B.R. 85, 88 (Bankr.S.D. Ohio 1981) (quoting O.R.C. § 3103.04). Thus, the cash paid to Bankers in exchange for issuance of Nancy Beckman's policy was the property of Richard Beckman.

**4.** 11 U.S.C. § 548(a)(2) states:
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year be-

fore the date of the filing of the petition, if the debtor voluntarily or involuntarily—
. . . .
(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B) (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

**5.** Pursuant to the terms of the whole-life policy, the insured—Nancy Beckman—is designated as the owner of the policy unless "stated otherwise in the application. . . ." Exhibit C at 11. Because the aplication did not state otherwise, *see* Exhibit C at 5, Nancy Beckman became the owner of the $100,000 whole life policy with a $4,873.45 cash surrender value by virtue of the $5,000 Transfer.

equivalent value' where it transfers its property in exchange for a consideration which passes to a third party. In such a case, it ordinarily receives little or no value." *Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.)*, 23 B.R. 28, 30 (Bankr.N.D.Ala.1982); *Ear, Nose & Throat Surgeons of Worcester, Inc. v. Guaranty Bank & Trust Co. (In re Ear, Nose & Throat Surgeons of Worcester, Inc.)*, 49 B.R. 316, 320 (Bankr. D.Mass.1985). The Court must ascertain whether the consideration given to the third person "ultimately land[ed] in the debtor's hands or otherwise confer[red] an economic benefit upon the debtor...." *See In Re Corporate Jet Aviation, Inc.*, 45 B.R. 629, 636 (Bankr.N.D.Ga.1985). The value of the benefit received by the debtor must approximate the value of the property transferred by the debtor. *Id.* Here, an analysis of the impact of this trilateral transaction clearly reveals that Richard Beckman failed to receive equivalent value in exchange for his purchase of the whole life policy for his spouse. In fact, the transfer appears to have been completely gratuitous. As such, it constitutes an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(2).

## C. *The Exemption Claim*

Debtors claim an exemption in the Policies pursuant to O.R.C. §§ 2329.66(A)(6)(b) and 3911.10. O.R.C. § 2329.66(A)(6)(b) states:

(A) Every person who is domiciled in this state may hold property exempt from execution, garnishment, attachment, or sale to satisfy a judgment or order, as follows:

....

(b) The person's interest in contracts of life or endowment insurance or annuities, as exempted by section 3911.10 of the Revised Code; ....

O.R.C. § 3911.10 provides in pertinent part as follows:

All contracts of life or endowment insurance or annuities upon the life of any person, or any interest therein, which may hereafter mature and which have been taken out for the benefit of, or made payable by change of beneficiary, transfer, or assignment to, the spouse or children, or any relative dependent upon such person, or any creditor, or to a trustee for the benefit of such spouse, children, dependent relative, or creditor, shall be held, together with the proceeds or avails of such contracts, subject to a change of beneficiary if desired, free from all claims of the creditors of such insured person or annuitant. Subject to the statute of limitations, the amount of any premium upon said contracts, endowments, or annuities, paid in fraud of creditors, with interest thereon, shall inure to their benefit from the proceeds of the contracts, ....

The Trustee contests Debtors' claim of exemption in the Policies, arguing that Debtors' payment of the premiums thereon was "in fraud of creditors" within the meaning of O.R.C. § 3911.10. Debtors vigorously dispute this contention. Because their intent in obtaining the Policies was merely to provide protection to their family, Debtors maintain, the Insurance Purchase was not fraudulent as to their creditors. Therefore, Debtors submit that their claimed exemption is proper and should be sustained.

The phrase "paid in fraud of creditors" contained in the Ohio exemption statute was analyzed by the Sixth Circuit in *Doethlaff v. Penn Mut. Life Ins. Co.*, 117 F.2d 582 (6th Cir.1941).[6] There, the debtor had been paying premiums on a life insurance policy for ten years. During the last four years of this ten-year period (the four years preceding debtor's bankruptcy filing) the debtor was insolvent. Noting the dearth of Ohio case law interpreting the phrase "in fraud of creditors," the Sixth Circuit stated:

[The statute] does not define the phrase "in fraud of creditors."

---

**6.** In *Doethlaff*, the Sixth Circuit interpreted the predecessor statute of O.R.C. § 3911.10—former Ohio General Code § 9394. Ohio General Code § 9394 was simply recodified as O.R.C. § 3911.10 and was identical in all material respects to the exemption provision at issue here.

....

We are left therefore to our own view of the law and it must be kept in mind that we are dealing with an exemption statute which is entitled to a construction liberal to the debtor. We think its meaning is that creditors have a remedy where premiums have been paid with intent to delay, hinder and defraud them and that the question of intent is one of ultimate fact to be determined upon a consideration of the attending facts and circumstances, such as the question of the insolvency of the insured, his attitude toward his debts, the amounts thereof, his prospective ability to liquidate them, whether the policy was issued before or after insolvency, its cash surrender value; and finally, whether after all he, in good faith, intended to provide by moderate premiums some protection to those who had a natural claim upon his bounty. 117 F.2d at 584. The Sixth Circuit's application of the foregoing criteria led it to conclude that debtor's claim of exemption in the life insurance policy should be sustained. In upholding the debtor's exemption claim the *Doethlaff* court stressed that there was "no evidence to indicate any actual intention upon the part of the insured [the debtor] to defraud his creditors...." *Id.* Presumably, this conclusion was based largely on the fact that the life insurance policies had been obtained by the debtor well in advance of bankruptcy (ten years before) and the premiums paid thereon were moderate.

■ The *Doethlaff* list is substantially the same as the criteria applied by this Court in concluding that the Insurance Purchase is subject to avoidance as a fraudulent transfer. *See* discussion, *supra,* at 10–15. The Court need not restate that analysis here. Suffice it to say that the evidence which established the existence of a fraudulent transfer under 11 U.S.C. § 548(a)(1) likewise compels the conclusion that the Insurance Purchase was made "in fraud of creditors" within the meaning of O.R.C. § 3911.10. *Id.*

Based upon the foregoing, the Court hereby ORDERS as follows:

(1) Judgment in favor of the Trustee on all counts of the Complaint shall be entered forthwith; and

(2) The Trustee's Objection to Exemption Claim is hereby SUSTAINED.

IT IS SO ORDERED.

## APPENDIX A

### Summary of debts and property

### (From the statements of the debtor in Schedules A and B)

| Schedule | DEBTS | Total |
|---|---|---|
| A-1/a,b | Wages, etc. having priority ............................................................................... | |
| A-1/c | Deposits of money ........................................................................................ | 5,220 00 |
| A-1/d(1) | Taxes owing United States ......................................................................... | |
| A-1/d(2) | Taxes owing states ...................................................................................... | |
| A-1/d(3) | Taxes owing other taxing authorities ...................................................... | unknown |
| A-2 | Secured claims .............................................................................................. | 1,141,472.00 |
| A-3 | Unsecured claims without priority .......................................................... | 209,781 96 |
| | Schedule A total ................ | 1,356,473 96 |

### PROPERTY

| Schedule | | Total |
|---|---|---|
| B-1 | Real property (total value) ...................................................................... | |
| B-2/a | Cash on hand .............................................................................................. | 30,100 00 |
| B-2/b | Deposits ........................................................................................................ | |
| B-2/c | Household goods .......................................................................................... | 800 00 |
| B-2/d | Books, pictures, and collections .............................................................. | 350 00 |
| B-2/e | Wearing apparel and personal possessions .... ........................................ | 225 00 |
| B-2/f | Automobiles and other vehicles .............................................................. | 23,400 00 |
| B-2/g | Boats, motors, and accessories ................................................................ | |
| B-2/h | Livestock and other animals ................ ................................................... | |
| B-2/i | Farming supplies and implements·........................................................... | 200 00 |
| B-2/j | Office equipment and supplies ................................................................ | |
| B-2/k | Machinery, equipment, and supplies used in business .... ... ..... .............. | |
| B-2/l | Inventory ............... .................................................................................. | |
| B-2/m | Other tangible personal property .......................................................... | |
| B-2 'n | Patents and other general intangibles ...... ........................................... | |
| B-2/o | Bonds and other instruments ................. ...... .......................................... | 34,500 00 |
| B-2/p | Other liquidated debts ................................................................................ | |
| B-2/q | Contingent and unliquidated claims ........................ .............................. | |
| B-2/r | Interests in insurance policies ......................... ... ................................... | |
| B-2/s | Annuities ......................................................... ..... ...... ............................. | |
| B-2/t | Interests in corporations and unincorporated companies ....................... | |
| B-2/u | Interests in partnerships ...................................... ..................... .. .......... | |
| B-2/v | Equitable and future interests, rights, and powers in personality ....... .. . | |
| B-3/a | Property assigned for benefit of creditors ........................................... | |
| B-3/b | ·Property not otherwise scheduled ... ...... .............. ..... .................. .... .......... | |
| | Schedule B total ... .. ...... ....... | 583,285 00 |

## Unsworn Declaration under Penalty of Perjury of Individual to Schedules A and B

I, __Richard W. Beckman and__ __Nancy S. Beckman__ _____, certify under penalty of perjury that I have read the foregoing schedules, consisting of _____ sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Executed on __1/9/86_____  Signature: _Nancy S. Beckman_ _Richard W. Beckman_ _____

## Unsworn Declaration under Penalty of Perjury on Behalf of Corporation or Partnership to Schedules A and B

I, _____, (the president _or other officer_ or an authorized agent of the corporation) (_or_ a member _or_ an authorized agent of the partnership) named as debtor in this case, certify under penalty of perjury that I have read the foregoing schedules, consisting of _____ sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Executed on_____  Signature: _____

©1982

Official Form No. 6 — Schedules of Assets and Liabilities.
Page 6

anderson publishing co. cincinnati, ohio 45201

# APPENDIX B

## Schedule B-2.—Personal Property

| Type of property | Description and location | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemptions claimed in Schedule B-4 | |
|---|---|---|---|
| A. Cash on hand | | $ | |
| B. Deposits of money with banking institutions, savings and loan associations, credit unions, public utility companies, landlords and others | CD-BancOhio<br>Nazaren Federal Credit Union | 30,000<br>100 | 00<br>00 |
| C. Household goods, supplies and furnishings | 8 rooms used furniture & appliances | 800 | 00 |
| D. Books, pictures, and other art objects, stamp, coin, and other collections | personal & dental books | 50 | 00 |
| E. Wearing apparel, jewelry, firearms, sports equipment, and other personal possessions | personal clothing<br>wedding rings | 75<br>250 | 00<br>00 |
| F. Automob'' trucks, trailers, and other vehicles | 1985 Ford Van<br>1981 Cougar<br>1977 Blazer<br>1976 Lincoln Continental | 13,000<br>3,600<br>3,600<br>3,200 | 00<br>00<br>00<br>00 |
| G. Boats, motors, and their accessories | | | |
| H. Livestock, poultry, and other animals | | | |
| I. Farming supplies and implements | bushhog, post hole digger, small handtools | 200 | 00 |
| J. Office equipment, furnishings, and supplies | | | |
| K. Machinery, fixtures, equipment, and supplies (other than those listed in Items J and L) used in business | | | |
| L. Inventory | | | |
| M. Tangible personal property of any other description | | | |
| | Sub Total<br>Forward to Page 5 | 548,785 | 00 |

Official Form No. 6 — Schedules of Assets and Liabilities.
Page 4

© 1979
anderson publishing co. cincinnati, ohio 45201

## Schedule B-2.—Personal Property

| Type of property | Description and location | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemptions claimed in Schedule B-4 | |
|---|---|---|---|
| | Sub Total | $ | |
| N. Patents, copyrights, franchises, and other general intangibles (specify all documents and writings relating thereto) | | | |
| O. Government and corporate bonds and other negotiable and nonnegotiable instruments | Federal Land Bank stock | 16,000 | 00 |
| P. Other liquidated debts owing debtor | Neal DuPugh | 18,500 | 00 |
| | life insurance policies | entire | |
| Q. Contingent and unliquidated claims of every nature, including counterclaims of the debtor (give estimated value of each) | | | |
| R. Interests in insurance policies (itemize surrender or refund values of each) | | | |
| S. Annuities | | | |
| T. Stock and interests in incorporated and unincorporated companies (itemize separately) | | | |
| U. Interests in partnerships | | | |
| V. Equitable and future interests, life estates, and rights or powers exercisable for the benefit of the debtor (other than those listed in schedule B-1) (specify all written instruments relating thereto) | | | |
| | Total | 583,285 | 00 |