**In re Forrest E. WILLIAMS & C. Delores Williams, f/d/b/a Forrest Williams, Contractor, Debtors.**

**The FIRST NATIONAL BANK OF CLAUDE, TEXAS, Plaintiff,**

v.

**Forrest E. Williams & C. Delores WILLIAMS, f/d/b/a Forrest Williams, Contractor, Defendants.**

**Bankruptcy No. 285–20052. Adv. No. 285–2033.**

United States Bankruptcy Court, N.D. Texas, Amarillo Division.

July 1, 1986.*

---

* This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

Thomas A. Bunkley, Jr., Lumpkin, Barras, Reavis & Bunkley, Amarillo, Tex., for First Nat. Bank of Claude.

Qlo Crum, Amarillo, Tex., for debtors.

## MEMORANDUM OF DECISION

JOHN C. AKARD, Bankruptcy Judge.

The First National Bank of Claude, Claude, Texas (Bank) filed a Complaint Objecting to the Discharge of Forrest E. Williams and C. Delores Williams, the Debtors in the captioned proceeding, under §§ 727(a)(3), (a)(4)(D), and (a)(5) of the Bankruptcy Code.[1]

### Facts

Mr. Williams is a skilled carpenter and experienced construction supervisor. The Debtors decided to go into business for themselves under the name of Forrest Williams, Contractor. Their lack of business acumen is demonstrated by the fact that they only stayed in business for approximately seven months.

In order to finance their business, the Debtors borrowed the following sums from the Bank:

a. Note dated October 29, 1984 in the amount of $6,510.00;

b. Note dated November 6, 1984 in the amount of $35,000.00;

c. Note dated November 21, 1984 in the amount of $60,000.00; and

d. Note dated January 11, 1985 in the amount of $30,000.00.

The amount owing to the Bank at the time of the hearing on this matter was in excess of $127,000.00. The notes were secured by Security Agreements covering ac-

---

1. The Bankruptcy Code is contained in Title 11      of the United States Code.

counts receivable dated November 6, 1984, November 14, 1984, November 21, 1984, and January 11, 1985. The Debtors also gave the Bank a Security Agreement dated November 29, 1984 covering all equipment and inventory. That Security Agreement included tools then owned and any thereafter acquired and wherever located.

The Debtors operated as subcontractors on the construction of various motels. One subcontract, from Falkner Construction Company, related to the construction of a 122–unit motel in Amarillo, Texas. On this motel, the Debtors had three subcontracts as follows:

a. For roofing—approximately $35,000.00;

b. For framing and rough carpentry—approximately $146,000.00;

c. For concrete work—approximately $150,000.00.

The Debtors had similar contracts from the same prime contractor with respect to motels in Irving, Texas and San Antonio, Texas. They had similar contracts from another prime contractor for work on motels in Amarillo and El Paso, Texas. The Court notes that each of the towns where the Debtors were doing work are several hundred miles from their home in Claude, Texas. Undoubtedly one of the Debtors' principal problems was Mr. Williams' inability to properly supervise the jobs. He testified that he visited each job approximately once each month.

Mrs. Williams wrote payroll checks and otherwise assisted in the business. Mr. Williams testified that the business records consisted of payroll records, copies of contracts, copies of loans and copies of paid bills. He did not indicate that there was any systematic record of receipts and disbursements, or that there was any attempt to determine whether the business was profitable.

The Debtors did not know what equipment of theirs was located on what jobs. Mr. Williams testified that the records of materials used in the various jobs were kept in the head of the foreman who was supervising the work for the Debtors.

Apparently the practice was for the Debtors to borrow funds on Thursday or Friday of each week in order to meet the payroll at their various jobs. The Debtors' draws from the prime contractors were directed to the Bank to be applied on the Debtors' account. It is not explained why the Bank ceased making the weekly loans. Presumably, the Bank discovered an ever-increasing debt and that the receipts from the various contracts were not meeting the monies paid out with respect to those contracts.

Mr. Williams testified that when he could not meet his payroll, he feared for his life and had to leave Claude in a hurry. He is now employed as a construction supervisor in Dallas, Texas.

Mr. Williams testified that when he left Claude, all of the records were put into two large boxes and delivered to the office of Ann Kenarian. She was not called to testify as a witness. Apparently she operates some type of bookkeeping service in Claude. There is no evidence that she had been employed to prepare any books whatsoever for the Debtors or that the reason for the records being in her office was other than for the purpose of storage.

It was stipulated that the Trustee-in-Bankruptcy requested the books and records of the Debtors but that the Debtors had not turned the records over to the Trustee.

The Bank was understandably anxious to determine the amounts owing on the various contracts since the Bank had a lien on accounts receivable. The Bank was also trying to determine the amounts owing within sufficient time to file mechanic's liens on the construction projects. The Debtors did not furnish the Bank sufficient information from which to determine the amounts owing on the contracts.

On one occasion, Mr. Williams went with an officer of the Bank to Ann Kenarian's office and spent approximately one hour going through the boxes of records. The parties then decided that it would be impossible to determine the amounts owing on

the various contracts from the material contained in those boxes. A second appointment was made to review the material in the boxes, but the Debtors did not keep that appointment.

The Debtors did not introduce any tax returns or financial records of any nature whatsoever at the hearing on this matter.

The Debtors' sole response to every question concerning their books and records was that all of the information which they had was in those two boxes in the office of Ann Kenarian in Claude, and that if the Bank wanted to straighten out the records, the Bank could send its employees to that office to do so.

Once the Debtors decided that their business had ceased, they apparently made no effort to go back to any of the construction projects. They have no idea what happened to the tools and equipment which were located on those jobs, other than to presume that the items were taken by their employees. The Debtors assert that they have a list of their equipment containing serial numbers, but they have not been able to produce that list.

## Conclusions

Section 727 provides that the Court *shall* grant the discharge unless one of the enumerated exceptions is proven. The first exception under consideration in this case is § 727(a)(3) which reads as follows:

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

This statute is derived from § 14(c)(2) of the Bankruptcy Act. The requirements of the Bankruptcy Code are substantially the same, and if anything, a bit more rigid, than the requirements of the Bankruptcy Act. In construing the Bankruptcy Act, the United States Court of Appeals for the Ninth Circuit wrote:

Section 14(c)(2) does not prescribe a rigid standard of perfection in keeping records or making business accounts. It simply requires that the bankrupt present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past. Each case rests of necessity on its own facts, and upon consideration of the bankrupt's specific business venture and the reasonable requirements of book and record keeping in that particular field.

*Rhoades v. Winkle,* 453 F.2d 51, 53 (9th Cir.1971).

The United States Court of Appeals for the Second Circuit stated:

The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies ... The purpose and intent of section 14(b) of the Bankruptcy Act is to make the privilege of discharge dependent upon a true presentation of the debtor's financial affairs. It was never intended that a bankrupt, after failure, should be excused from his indebtedness without showing an honest effort to reflect his entire business and not a part merely. To be sure, there may be records which are not books; but it is intended that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained. Records of substantial completeness and accuracy are required so that they may be checked

against the mere oral statements or explanations made by the bankrupt. *In Re Underhill*, 82 F.2d 258, 259–260 (2nd Cir.1936).

 The "combination of the debtor's suspiciously vague testimony and his failure to produce many essential records" can lead to the denial of the discharge. *In Re Kottwitz*, 42 B.R. 566 (Bankr.W.D.Mo. 1984).

 Due to the Debtors' relatively short time in business and the apparent fact that the Debtors had no prior business experience, the Debtors should not be required to maintain a large and extensive bookkeeping system. On the other hand, the Debtors had contracts totaling several hundred thousand dollars. Certainly they should have maintained a reasonable set of records from which their financial condition and business transactions might be ascertained. They did not do so. From the evidence presented, the Debtors could not prepare even the most rudimentary tax return. The lack of business records has totally frustrated the efforts of the Trustee and the Bank to make any recovery in this proceeding.

Although Mr. Williams appears to have been the prime mover of the business, Mrs. Williams assisted him in the very area under consideration. It is the opinion of the Court that she should bear equal responsibility for the lack of records in this business. The Court does not feel that the failure to keep records was in any way justified under all of the circumstances of this case. See *In re Stalco TV & Appliance Co.*, 129 F.Supp. 490 (D.C.Tex.1955).

For the foregoing reasons, the Debtors should be denied a discharge.

Having determined that the Debtors should be denied a discharge under § 727(a)(3), it is not necessary for the Court to discuss the Bank's contentions under §§ 727(a)(4)(D) and 727(a)(5).

ORDER accordingly.