In re Deborah L. ZELL, Debtor.

G & J INVESTMENTS, Plaintiff,

v.

Deborah L. ZELL, Defendant.

Bankruptcy No. 2–87–05441.
Adv. No. 2–88–0234.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Nov. 29, 1989.

Deborah L. Zell, Kingwood, Tex., pro se.

Larry J. McClatchey, Marie L. Appleby, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, for G & J Investments, Inc.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Matters*

Presently under consideration by the Court is an adversary proceeding to determine the debtor's eligibility to receive a discharge in her Chapter 7 bankruptcy case. The debtor's entitlement to a discharge in bankruptcy has been challenged by G & J Investments, whose complaint requests denial of debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), (3), and (5). A trial was held on October 25, 1989, after which the matter was taken under advisement.

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding arising under 28 U.S.C. § 157(b)(1), and (b)(2)(J). The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule ("Rule") 7052.

### II. *Findings of Fact*

1. Deborah L. Zell ("Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code on December 7, 1987. On May 5, 1988, she voluntarily converted her Chapter 11 case to a proceeding under Chapter 7.

2. The Complaint objecting to Debtor's discharge was filed on August 22, 1988. After two extensions of time in which to plead, an answer was filed on October 25, 1988. On October 20, 1988, Thomas H. Grace, Debtor's counsel, requested permission to withdraw as counsel due to Debtor's inability to pay attorney's fees. Grace's request was granted by this Court's order of August 2, 1989.

3. The Debtor was unable to secure replacement counsel and appeared *pro se* at trial. Although the official court file reflects proper service of the Complaint upon her, Debtor represented that she had never seen the Complaint and was not familiar with its allegations. The Court, *sua sponte*, explained the allegations of the Complaint in summary fashion and emphasized the gravity of the relief requested. The Court advised the Debtor that she could request a continuance of the trial on the grounds that she needed additional time to prepare her defense or obtain counsel for that purpose. The Debtor advised the Court of her inability to afford counsel and her desire to proceed to trial as scheduled. The Court thereupon recessed the trial for approximately one hour to give the

Debtor an opportunity to review the Complaint as well as proposed findings of fact and conclusions of law handed to her by Plaintiff's counsel when the Court convened.

4. In August of 1984, the Debtor formed a partnership with her sister which commenced operations in Bellefontaine, Ohio, as a retail clothing store under the name of "Captain Kid's, Inc." It appears that the Debtor's sister subsequently withdrew from the partnership and Debtor continued conducting the business as a sole proprietorship. Captain Kid's began its operations with the organizational assistance of Marlena Fashions, a so-called "store-opening" company based in Atlanta, Georgia. Captain Kids became a wholesale supplier to other retail children stores as Debtor opened additional retail clothing businesses.

5. Gordon Zell, Debtor's former father-in-law, and Jeffrey Zell, the Debtor's former husband, formed G & J Investments, a general partnership, and served as its president and vice-president, respectively.

6. G & J Investments agreed to develop a retail shopping mall in Bellefontaine. Because operation of the mall would generate new jobs, the city received a grant of $150,-000 from the Ohio Department of Development to fund the initial stages of the project.

7. It was anticipated that the mall would attract 12 to 15 small retail businesses as tenants. The Debtor had committed to open one store in the mall, a retail women's apparel store named "Baxter's." However, when no other tenants could be secured, the Debtor agreed to rent all of the space in the mall. Apparently, other potential tenants found the lease terms proposed by G & J Investments to be unacceptable. The Debtor's principal, if not sole, reason for agreeing to lease the entire mall was her desire to see the mall succeed.

8. The Debtor leased all of the space in the mall, including the basement, which was used as a warehouse for children's clothing. G & J Investments owned and managed the mall, and thus served as Debtor's landlord.

9. After opening Baxter's, the Debtor opened five additional retail stores in the mall. Captain Kid's was not located in the interior mall area, but was a free-standing building situated in the mall's parking lot. The Debtor employed an average of 20–25 employees in her various stores.

10. The Debtor understood the importance of inventory control and the necessity of maintaining accurate records in her stores. Accordingly, she purchased and had installed a computer in the stores to assist her in recording all business transactions.

11. The Debtor never paid herself a salary. At times, however, Debtor's personal expenses were paid with proceeds from sales of the businesses. Specifically, the Debtor, on occasion, removed cash from the stores' cash registers after the filing of the Chapter 11 bankruptcy petition to pay certain personal expenses. No sale proceeds were used, however, by the Debtor for personal obligations after the case was converted to a Chapter 7 proceeding.

12. The Debtor was solely responsible for purchasing merchandise for the stores and made frequent trips to New York City for this purpose.

13. In September of 1987, while Debtor was on a buying trip in New York, Jeffrey Zell filed a complaint for divorce against her. The Debtor's clothing and other personal effects were removed from the couple's house and deposited in a storage area in the rear portion of Captain Kid's. Jeffrey Zell refused to allow Debtor back into the couple's house for any reason after filing of the divorce complaint.

14. Thereafter, in October, 1987, Gordon Zell obtained a money judgment against the Debtor and a court order closing the stores. Apparently, the judgment arose out of an unpaid loan Gordon Zell made to Debtor which served as initial capitalization for her businesses.

15. The stores remained closed during November, 1987. During this period, Debtor's office, located in the mall, was broken into. Business files were ransacked and the computer was damaged beyond repair. All

transactions occurring after this time, including the December shipment of merchandise to Atlanta, were manually documented on legal pads.

16. In late November, the Debtor granted Gordon Zell a security interest in unspecified personalty pursuant to a written security agreement. As a result, he apparently ceased all efforts to enforce his judgment against Debtor, which enabled her to reopen the stores at the end of that month.

17. The closing of Debtor's stores for most of October and November, 1987, was especially damaging to the businesses because it prevented Debtor from purchasing inventory in anticipation of the Christmas season, the heaviest buying season for Debtor's businesses. The termination of business operations during this traditionally popular shopping season, in combination with negative publicity printed in the local newspapers regarding alleged physical abuse occurring in the stores against the Debtor by Jeffrey Zell, led to the Debtor's need to seek protection in this Court.

18. After discussions with Grace, the Debtor decided to attempt reorganization of her financial affairs under Chapter 11 of the Bankruptcy Code. Prior to filing the petition, Grace informed the Debtor that his legal services for filing the Chapter 11 petition and representing her in matters relating to the petition would require a retainer of $15,000. The Debtor did not possess $15,000 with which she could pay for Grace's legal services.

19. Subsequent to Grace's request for a retainer, Debtor contacted Bob Weaver, the president of Marlena Fashions, to arrange an expedited sale of merchandise from Debtor's wholesale business so as to generate at least $15,000 to pay Grace. Weaver informed the Debtor of three soon-to-be-opened retail stores which would need the type of merchandise she was offering for sale. After explaining her extenuated circumstances and immediate need for money, Weaver made arrangements for Debtor's merchandise to be shipped to a warehouse in Atlanta, on December 4, 1987, where it would later be redistributed to the three new stores. The funds acquired pursuant to this transaction were wired directly to Grace as his retainer for the bankruptcy proceeding. This transaction was documented manually by the operations' and retail manager of the stores, Gloria Capri ("Capri").

20. As a result of the filing of the bankruptcy petition, the Debtor was unable to obtain credit from wholesale suppliers and was forced to make all inventory and related business purchases on a "C.O.D.", or cash-on-delivery, basis only. On numerous occasions, the Debtor or her employees, at the Debtor's direction, withdrew cash proceeds from the cash registers to pay for newly-arriving shipments of merchandise. In addition, the Debtor, or employees of the Debtor acting on her behalf, removed cash proceeds from the registers in order to finance the Debtor's buying trips to New York. The Debtor directed Capri to document all transactions involving the removal of monies from the cash register. The Debtor further provided the bookkeeper, Teri Havens ("Havens"), with receipts or documentation of business expenditures incurred during buying trips.

21. After the filing of the Chapter 11 petition, Grace provided forms to the Debtor who, in turn, provided them to her employees to document the withdrawal of all cash proceeds from the cash registers or other accounts. The completed forms were sent to Grace on a weekly basis for his review and, presumably, incorporation in monthly operating reports which had to be filed with the Court.

22. In December, 1987, on an unspecified date after the filing of the Chapter 11 petition, the Debtor contacted Havens from New York and requested that she ship an assortment of merchandise to the Debtor in New York. All such merchandise was placed into one box and shipped by Havens, as directed. The Debtor gave these items to her major vendors as Christmas presents. Although the Debtor did not provide Havens with definitive directions to document this transaction, the Debtor also did not order Havens to refrain from recording the transaction.

23. On various occasions throughout the pendency of the Debtor's Chapter 11 proceeding, the Debtor removed clothing and other personal effects from the stores. The items of clothing were worn by Debtor on buying trips to promote her merchandise. The Debtor documented the occasions in which she removed merchandise for this reason or assumed one of her employees would do so, as this constituted part of their job responsibilities.

24. On some unspecified date during the pendency of the Chapter 11 proceeding, the Debtor, in an attempt to reduce expenses, moved inventory out of the warehouse in the mall and into a smaller warehouse located in the rear of Captain Kid's.

25. Debtor's prepetition and postpetition operation of her businesses was hampered by constant interference, such as the turning off and on of lights in the stores at random times during business hours and increasing or decreasing of room temperatures in the stores to extreme levels. In addition, Debtor's car was vandalized, her phone was tapped and some merchandise was removed from stores by the Debtor's former mother-in-law without payment.

26. Gordon and Jeffrey Zell, the two partners comprising G & J Investments, changed all the locks on the mall's entrances, making it difficult for Debtor to enter or exit the mall except with their permission. The Debtor was limited by G & J Investments to admission into the mall at specified times during the day. The Debtor also had to leave the premises by 6:15 p.m. or risk being locked in the mall until the following morning. The landlords' conduct in this respect greatly restricted the Debtor's business opportunities as she needed the evening hours to transact business with retail stores on the West Coast, which were in a different time zone.

27. The Debtor made a sincere and honest attempt to maintain accurate business records but the constant interference with operations and destruction of critical records made it virtually impossible for her to conduct the business in a proper or orderly fashion.

28. The majority of the witnesses subpoenaed by G & J Investments to testify at trial were former employees of the Debtor whom she had terminated or who had resigned at Debtor's insistence. All the witnesses were employed less than a year by the Debtor. Much of their testimony lacked credibility.

29. After converting her case to a case under Chapter 7 of the Bankruptcy Code, the Debtor was advised by her attorney to leave all files and records in a secure location on the mall premises. Following her attorney's recommendation, the Debtor removed only the personal articles in her office, personal trade materials and publications, and her personal clothing and effects which her husband had deposited in the rear of Captain Kid's upon filing for divorce. These personal items were boxed and later packed into the Debtor's private vehicle by several store employees. The Debtor locked all business records and accounts in her office at the mall. Subsequently, the office was entered by an unknown person or persons and all such records were removed. Debtor did not remove said records. These records remain missing and unaccounted for. Likewise, there is no credible evidence that any merchandise was concealed, transferred or removed by the Debtor when she closed the stores and converted her case to a case under Chapter 7.

30. The Debtor remains unaware of the location of her business records. Debtor has never transferred, removed, destroyed, mutilated or concealed property of the Debtor, within one year before the date of filing the petition, or property of the estate, after the filing of the petition, nor was there any evidence supporting such objectionable conduct.

31. The Debtor never concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which the Debtor's financial condition or business transactions might be ascertained.

32. The Debtor transferred or removed limited items of her personal property prior to filing the petition, and property of the

estate after the filing of the petition, but never possessed an intent to hinder, delay or defraud G & J Investments, any other creditor or any officer of the estate.

33. The Debtor has satisfactorily explained all transfers, removals, or losses of assets and financial records.

## III. *Discussion*

### A. *Preliminary Observations*

The Court notes that at all times relevant to the alleged transfers, the Debtor either had not sought the protection of the Bankruptcy Code and was, therefore, empowered to conduct business at her discretion, or the Debtor was a Chapter 11 "debtor-in-possession" who had the rights and powers of a trustee in accordance with § 1107(a).[1] Code Section 1107, read in conjunction with § 1108,[2] empowers a debtor-in-possession with far reaching discretion to operate its business, unless the Court orders otherwise. In *In re Curlew Valley Assocs.*, 14 B.R. 506 (Bankr.D.Utah 1981), the court found that the policy of § 1108 is to promote the preeminent goal of the Bankruptcy Code to "divorce the court from ministerial duties and to confide it to adjudicative functions." *Id.* at 511. Accordingly, the Court, in line with the *Curlew Valley* court, will consider the alleged wrongful transfers in light of the principles expressed in §§ 1107 and 1108 which grant the debtor-in-possession a wide range of authority in conducting its business.

### B. *Objections to Discharge*

 The Code section governing discharge of a Chapter 7 debtor is 11 U.S.C.

§ 727. This provision provides, in relevant part, as follows:

(a) The court shall grant the debtor a discharge, unless

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, or mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

. . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets to meet the debtor's liabilities.

A discharge relieves the debtor of legal responsibilities for all debts deemed dischargeable and provides the debtor with a "fresh start." The legislative history to § 727 describes this section as "the heart

---

1. 11 U.S.C. § 1107. Rights, powers, and duties of debtor in possession.

(a) Subject to any limitations on a trustee serving in a case under this chapter [11 USCS §§ 1101 et seq.], and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title [11 USCS § 330], and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title [11 USCS § 1106(a)(2), (3), and (4)], of a trustee serving in a case under this chapter [11 USCS §§ 1101 et seq.].

(b) Notwithstanding section 327(a) of this title [11 USCS § 327(a)], a person is not disqualified for employment under section 327 of this title [11 USCS § 327] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

2. 11 U.S.C. § 1108. Authorization to operate business.

Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business.

of the fresh start provisions of the bankruptcy law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977), U.S.Code Cong. & Admin.News 1978, p. 6340. Because the Code's goal is to afford the debtor a fresh start, the provisions providing for the denial of discharge are to be construed liberally in favor of the debtor and strictly against the creditor. 4 *Collier on Bankruptcy*, Para. 727.01A, 727–9 (15th Edition, 1989). The bankruptcy court should limit denial of discharge to those cases where a debtor's actions are truly blameworthy in an equitable sense. *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953, 957 (Bankr.D.Minn. 1987).

With respect to the burden of proof, Rule 4005 provides that "[a]t the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection." The 1983 Advisory Committee Note to Rule 4005 explained that a § 727 objector has the ultimate burden of persuasion, but the evidentiary degree that an objector must sustain was left purposely unexplained:

> This rule does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector ...

B.R. 4005 Advisory Committee's Note (1983).

In formulating rules regarding the burden of going forward, the courts generally have balanced the competing interests of promoting the Code's fresh start policy and preventing the dishonest debtor, seeking the shelter of the bankruptcy laws, from playing "fast and loose with their assets or the reality of their affairs." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987). *Accord, In re Shebel*, 54 B.R. 199 (Bankr.D.Vt.1985). As to be expected, there is a split of authority among the bankruptcy courts as to whether the proper burden is satisfied by a preponderance of the evidence [3] or whether the objector must establish his proof by clear and convincing evidence.[4] At present, the Sixth Circuit has not directly addressed this issue. However, after reviewing the cases dealing with the requisite burden, this Court is persuaded by and embraces the line of authority advocating application of a clear and convincing standard. As noted in *In re Booth*, 70 B.R. 391, 394 (Bankr.D.Colo. 1987):

> "[a]n attack on dischargeability under § 727 is much more severe in its effect than excepting a single debt from discharge under § 523. Because of this severity, and in furtherance of the concept of a 'fresh start' for debtors, it is this Court's view that the clear and convincing standard must apply in establishing proof of nondischargeability."

Adopting the reasoning employed by the *Booth* court, the Court concludes that G & J Investments ("Plaintiff") must prove by clear and convincing evidence that the Debtor's discharge should be denied.

The objections to discharge filed by the Plaintiff are premised on three distinct grounds. The Court will address each ob-

---

**3.** *See Farmers Co-op. Ass'n. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *In re Robinson*, 506 F.2d 1184, 1184 (2d Cir.1974); *In re Merritt*, 28 F.2d 679, 680 (9th Cir.1928); *In re Slocum*, 22 F.2d 282, 285 (2d Cir.1927); *Cobb v. Hadley (In re Hadley)*, 70 B.R. 51, 53 (Bankr.D.Kan.1987); *Kunce v. Kessler (In re Kessler)*, 51 B.R. 895, 898–99 (Bankr.D.Kan.1985); *Conti–Commodity Services, Inc. v. Clausen (In re Clausen)*, 44 B.R. 41, 45 (Bankr.D.Minn.1984); *see also, In re Perlmutter*, 256 F. 862, 863 (D.N.J.1919); *In re Doyle*, 199 F. 247, 255 (W.D.N.Y.1912).

108 B.R.—15

**4.** *See Ford v. Poston (In re Ford)*, 53 B.R. 444 (W.D.Va.1984), aff'd. 773 F.2d 52 (4th Cir.1985); *Bank of Pennsylvania v. Adlman (In re Adlman)*, 541 F.2d 999, 1005 (2d Cir.1976); *In re Taub*, 98 F.2d 81, 82 (2d Cir.1938); *In re Dauchy*, 130 F. 532, 533 (2d Cir.1904); *Camacho v. Martin (In re Martin)*, 88 B.R. 319, 321 (D.Colo.1988); *Booth v. Booth (In re Booth)*, 70 B.R. 391, 394 (Bankr.D.Colo.1987); *Fox v. Cohen (In re Cohen)*, 47 B.R. 871, 874–75 (Bankr.S.D.Fla.1985); *Taylor v. Lineberry (In re Lineberry)*, 55 B.R. 510, 513 (Bankr.W.D.Ky.1985).

jection and determine its validity separately.

### 1. *11 U.S.C. § 727(a)(2): Transfer of Property with Intent to Hinder, Delay, or Defraud a Creditor.*

■ In assessing any objection to discharge pursuant to 11 U.S.C. § 727(a)(2), the Court must analyze the proceeding by determining whether the plaintiff has met its burden of proving all the statutory elements of the objection. The four elements of a § 727(a)(2) violation are:

a. a transfer of property occurred, made by the debtor or made at his direction;

b. the transfer involved property of the debtor;

c. the transfer was made within one year of the commencement of the bankruptcy case;

d. the debtor had, contemporaneously with the transfer, intent to hinder, delay or defraud a creditor.

4 *Collier on Bankruptcy,* Para. 727.02, 727–11 (15th Edition, 1989). *See also Panuska v. Johnson (In re Johnson),* 80 B.R. 953, 957 (Bankr.D.Minn.1987); *Peoples State Bank v. Drenckhahn (In re Drenckhahn),* 77 B.R. 697, 704 (Bankr.D.Minn. 1987); *Conti–Commodity Services, Inc. v. Clausen (In re Clausen),* 44 B.R. 41, 43 (Bankr.D.Minn.1984). "The language of § 727(a)(2)(A) demonstrates that Congress intended to deny discharge to debtors who take actions designed to keep their assets from their creditors either by hiding the assets until after they obtain their discharge in bankruptcy or by destroying them." *Adeed v. First Beverly Bank (In re Adeed),* 787 F.2d 1339, 1344–45 (9th Cir. 1986).

■ The discharge of debts pursuant to § 727(a)(2) may only be denied upon a finding of actual intent to hinder, delay, or defraud creditors. *See 4 Collier on Bankruptcy,* Para. 727.02[3], 727–13 727–17. Constructive fraudulent intent cannot be the basis for denial of a discharge. *In re Devers,* 759 F.2d 751, 753 (9th Cir.1985). Intent, however, "may be established by circumstantial evidence, or by inferences

drawn from a course of conduct." *Id.* at 753–54.

■ The Plaintiff's complaint fails to plead with particularity exactly which property it is alleging has been transferred or removed with the intent to hinder, delay or defraud it. This, in and of itself, would be sufficient grounds to defeat the complaint; nevertheless, the Court will construe the complaint so as to conclude that the Plaintiff is referring to the shipment of merchandise to Atlanta, immediately preceding the filing of the bankruptcy petition; the shipment of gift items to New York, during the Christmas season; the withdrawal of cash proceeds from the cash registers; the removal of clothing which was then worn by the Debtor; and the alleged removal of inventory and equipment in May of 1988.

■ The Court will first consider the shipment of merchandise to Atlanta. It is uncontested that the Debtor did, in fact, direct the shipment of merchandise to Atlanta. Thus, the Plaintiff has complied with the first, second and third elements of the above-described test; where the Plaintiff has fallen short of meeting its burden is with regard to the fourth element. The Plaintiff has failed to demonstrate that the Debtor purposely intended to hinder, delay, or defraud the Plaintiff in directing shipment of the goods in question. On the contrary, the goods were sold through Mr. Weaver for the sum of $15,000. That money was then sent directly to Debtor's bankruptcy counsel as his retainer for filing the Chapter 11 case. There is no evidence that use of these funds was improper or that the Debtor intended to hinder or defraud G & J Investments. In fact, the evidence shows clearly that the $15,000 in proceeds were used for a legitimate business purpose—to pay an attorney to represent the Debtor in her reorganization effort.

Even if the Court were not convinced by the Debtor's evidence of contrary intent, the Plaintiff's evidence, standing alone, simply does not fulfill the clear and convincing standard necessary to demonstrate that the Debtor purposefully intended to hinder, delay or defraud G & J Investments

or other creditors. Debtor's principal accuser as to this allegation was Capri who equivocated in her testimony: first, she stated on direct examination that the Debtor instructed her not to keep a record of the transactions, then, on cross examination, Capri changed her testimony, indicating that, pursuant to the Debtor's instructions, the transaction was manually recorded on legal pads because of damage to the computer. Transcript at 24–27. Capri's equivocation here was representative of her overall testimony, which testimony the Court found to be generally unreliable and lacking in probative value. Simply put, G & J Investments did not adduce sufficient evidence through Capri's testimony or through other evidence to persuade this Court that Debtor intended to hinder, delay or defraud any creditor in connection with the sale of merchandise to businesses in Atlanta.

■ Plaintiff's case under § 727(a)(2) also fails as to the alleged unlawful disposition of gift items shipped to the Debtor in New York. The Debtor's own testimony on the matter conforms to most of the testimony of the Plaintiff's witnesses. The Debtor admits that she directed Havens and Capri to ship a box of gift items to her during a buying trip in New York prior to the Christmas holiday. However, where Havens' and the Debtor's testimony diverge is on the issue of documentation.

Havens, the Debtor's bookkeeper, testified on cross-examination that the Debtor gave her a list of items that she requested be sent to her in New York; later Havens stated that she memorized the items requested by the Debtor. Transcript at 82–83. As evident, her testimony, like that of Capri's, was unclear and contradictory. Further, the Court finds it odd, whether the list was written or oral, that Havens, as a certified bookkeeper, did not document the transaction. The Court record reveals Havens purposely evaded the Debtor's question on five separate occasions as to whether she explicitly was told not to doc-

ument the transaction. This leads the Court to conclude that although the Debtor did not specifically request Havens to document the transaction, she did not order her to refrain from such documentation.[5] Finally, the Court possesses doubt as to Havens' ability to assess accurately the Debtor's financial status in light of the fact that she worked as the Debtor's bookkeeper for a mere two months and she had no apparent previous experience in the financial aspect of the retail industry.

■ The Court must now turn to the alleged withdrawal of cash proceeds from the cash register. On its face, this is the most questionable act placed in contention by the plaintiff under § 727(a)(2). The Plaintiff presented several witnesses who testified that cash proceeds from retail sales were being withdrawn from the cash register, on a regular basis, by the Debtor, herself, or by an employee, at the direction of the Debtor. The responses elicited from these witnesses, however, did not support the inference that the Debtor removed the cash proceeds with the intent to hinder, delay, or defraud creditors. *See In re Drenckhahn*, 77 B.R. at 706; *In re Reed*, 18 B.R. 462 (Bankr.E.D.Tenn.1982). In fact, the Plaintiff's case did not establish or even support the inference of fraudulent intent.

The witnesses testifying on behalf of the Plaintiff, instead of repudiating the Debtor's testimony, bolstered her defenses. Capri explained that after the Chapter 11 bankruptcy petition was filed, all business transactions were consummated on a cash basis only. The Court concludes, from testimony presented, that a great deal of the cash proceeds removed from the registers was used to pay for new shipments of inventory.

Q. ... as far as though when money was taken out of the registers when I [Debtor] requested money, cash being taken to pay for—many times, was it not to pay cash for C.O.D.'s?

A. Yes.

---

**5.** As a collateral matter, the Court notes that under the circumstances, the Debtor's decision to give gifts to her valued customers was not

inappropriate, unless the Plaintiff is able to make some showing of bad faith or the intent to hinder, delay, or defraud creditors.

Q. Because we could not get—once the Chapter 11 was filed, we did not have credit with our different accounts anymore, and when we got shipments, did not many times it have to be paid for by cash?

A. Yes.

Transcript at 32.

This testimony, in combination with other testimony adduced at trial, negates the allegation that the Debtor was purposefully attempting to hinder, delay or defraud the Plaintiff. After the filing of the Chapter 11 petition, the trade creditors required cash-on-delivery for all purchases. Although the Debtor's accounting system was less than perfect, and not all removals of cash were documented, the record is utterly devoid of any evidence of an intent to injure the Plaintiff in the use of cash proceeds.

■ Finally, the Court will address the Plaintiff's allegations that the Debtor removed equipment and inventory from the store locations. As to this matter, the Plaintiff's case pursuant to § 727(a)(2) also fails on the element of intent. The Debtor conceded that she directed employees to load her automobile with boxes; however, the Debtor testified that the boxes contained trade materials and other personal items. The Court found Debtor's testimony on this issue to be credible, and notes that it was uncontroverted.

The two witnesses testifying on behalf of the Plaintiff, Blake Kenner ("Kenner") and Vannessa Williams ("Williams"), were unable to identify conclusively any items contained in the boxes. On direct examination, Kenner admitted that he had no knowledge as to the contents of the boxes. Transcript at 55. Williams' testimony was equally unsubstantiating and convoluted:

Q. Did you participate in assisting Mr. Kenner to load boxes into Mrs. Zell's private vehicle?

A. Yes.

Q. Do you recall what was in those boxes that were being placed into her vehicle?

A. The only thing that I know of, there was a lot of papers. I don't know what was in them, but there was boxes full of papers.

Q. Were they papers from her office?

A. Yes.

Q. Do you recall if they were business records?

A. I can't recall.

Q. Are you familiar with invoices?

A. Yes.

Q. Were there any invoices there?

A. I would say so, Yeah.

Q. Do you recall seeing invoices?

A. No, I'd have to say, no.

Q. Are you familiar with bank statements?

A. Yes.

Q. Do you recall ever seeing any bank statements?

A. No.

Transcript at 64–65.

Clearly, the Plaintiff has not produced any convincing evidence that the Debtor intended to affect adversely its interest in removing boxes from the stores to her personal vehicle. These witnesses were unable to identify the contents of the boxes, and this Court is not at liberty to assume the boxes contained inventory or equipment in the absence of supporting evidence.

■ In consideration of Plaintiff's contention that the Debtor used "the inventory of the stores as her closet", the Court finds this allegation to be unsubstantiated by the quantum of evidence necessary to sustain Plaintiff's burden. The evidence submitted by both parties did indicate that the Debtor often wore clothing or accessories taken from the inventories of the stores for business purposes. The evidence, however, did not establish that the Debtor's use of such inventory was improper or that she intentionally failed to record the removal of the merchandise. Likewise, there is no evidence that she kept such merchandise. Because the court record is once again lacking evidence of objectionable intent or conduct, the Court must deny Plaintiff's objection on this ground.

2. *§ 727(a)(3): Failure to Keep and Preserve Recorded Information Relating to Debtor's Financial Condition or Business Transactions.*

▮▮▮▮ While § 727(a)(3) could be interpreted in a draconian fashion to require maintenance, preservation, and production of comprehensive records of ever minute detail of a debtor's financial and business activity as a precondition to a grant of discharge, the weight of decisional authority unequivocally demonstrates that this interpretation is wholly inappropriate. *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir.1971) (Act case); *In re Drenckhahn*, 77 B.R. at 707; *First National Bank v. Williams (In re Williams)*, 62 B.R. 590, 593 (Bankr.N.D.Tex.1986); *Broad Nat'l. Bank v. Kadison*, 26 B.R. 1015, 1018 (Bankr.D.N.J.1983). Unquestionably, the purpose of the statute is to "assure ... the trustee and creditors that they will be provided with sufficient information with which they can assess the debtor's estate and general financial posture." *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 847–48 (Bankr.E.D.N.Y.1986). To this end, the objecting party must demonstrate that reasonable grounds exist to believe that the debtor kept inadequate records of all business transactions. 4 *Collier on Bankruptcy*, Para. 727.03, 727–49 (15th Edition, 1989). The Court must view the adequacy of the debtor's books and records, for the purposes of § 727(a)(3), on a case-by-case basis, according to the special characteristics of the debtor's occupation, business, and personal financial structure. *Leverage Leasing Corp. v. Reitz (In re Reitz)*, 69 B.R. 192, 197 (N.D.Ill.1986); *In re Williams*, 62 B.R. at 593; *In re Hogard*, 43 B.R. 590 at 594 (Bankr.D.Minn.1984).

▮▮▮▮ Although the debtor must take the necessary steps to sufficiently inform creditors of his financial status by keeping or preserving books or records, the law does not mandate that the financial records be kept in any special manner. *International Shoe Co. v. Lewine*, 68 F.2d 517, 518 (5th Cir.1934). The adequacy of the debtor's financial records is assessed after accounting for several relevant facts: the debtor's education, business experience, and sophistication; the complexity of the debtor's business; the amount of credit extended to the debtor during his business activity; and all other circumstances which should be considered in the interest of justice. *Seidle v. Escobar (Matter of Escobar)*, 53 B.R. 382, 384 (Bankr.S.D.Fla.1985); *Green Hill Corp. v. Kim (In re Kim)*, 97 B.R. 275 (Bankr.E.D.Va.1989). The Bankruptcy Court is afforded broad discretion in assessing these factors in conjunction with the relevant facts of the case. However, the Court's final determination must be made in light of the purpose of § 727(a)(3), which is to preserve its goal of fair dealing by making a debtor's right to discharge dependent on his ability to account, *via* written record, for his financial condition. *In re Reitz*, 69 B.R. at 197; *Broad Nat'l. Bank v. Kadison*, 26 B.R. at 1018; *Federal Deposit Ins. Corp. v. Tackett (In re Tackett)*, 67 B.R. 354, 359 (Bankr.E.D.Tenn. 1986); *In re Williams*, 62 B.R. at 593; *Calcasieu Marine Nat'l. Bank v. Grimes (In re Grimes)*, 58 B.R. 368, 371 (Bankr.W. D.La.1986); *Hunter v. Kinney (In re Kinney)*, 33 B.R. 594, 596 (Bankr.N.D.Ohio 1983); *Milam v. Wilson (Matter of Wilson)*, 33 B.R. 689, 691 (Bankr.M.D.Ga. 1983).

▮▮▮▮ Applying the applicable legal doctrine to the facts presented at trial, the Plaintiff has fallen short of its burden of demonstrating that the Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information. While the Court is aware of the allegations submitted by the Plaintiff concerning the Debtor's lack of recorded documentation, this allegation was not supported by clear and convincing evidence. In fact, very little evidence addressed this contention.

The Court concedes that the Debtor may not have kept the most fastidious and precise business records. But, this factor, in light of prevailing circumstances and the fact that the Debtor appears to be a relatively unsophisticated businesswoman, is justifiable. Moreover, once the Debtor sought relief under Chapter 11 of the

Bankruptcy Code, her trade creditors would not extend her credit. As a result, all purchases of inventory were handled on a cash-only basis. The Debtor relied heavily on her bookkeeper, Havens, to document these transactions. Perhaps, the Debtor should have taken a more active role in assuring that this task was accomplished, but in considering the Debtor's responsibility for maintaining and purchasing inventory for the seven stores, the Debtor's expectation that the documentation would be properly performed by Havens was reasonable.

■ Further, the Court does not find the Debtor's inability to produce records from her business grounds for denying her a discharge pursuant to § 727(a)(3). After conversion of the case to a proceeding under Chapter 7, the Debtor followed Grace's instructions and left all business files and records secured in her mall office, with the exception of a few documents needed to complete the taxes. Those few documents are in the custody of a person identified by Debtor. The Plaintiff has seemingly taken the position that the inconsistent testimony of Williams and Kenner, which alleges that the Debtor removed business records from the premises, satisfies the quantum of proof necessary to sustain a § 727(a)(3) objection. It does not. The testimony of these two individuals was so contradictory and inconclusive that its net effect was harmful, not helpful, to the Plaintiff's case.

The more believable testimony in this proceeding is that of the Debtor. She vehemently denied destroying, concealing or hiding any business records. Her testimony on this and other issues was consistent throughout the proceeding and provided the Court with credible evidence regarding her role in preserving records of her business. In short, Debtor is not blameworthy for the loss of the files and records in question. In fact, she made every reasonable effort to preserve the records. It is not her fault that someone broke into the mall office and removed the records after she had vacated the premises. Thus, it is clear that the Plaintiff has not supported

its objections under § 727(a)(3) and, accordingly, they must be denied.

After discussing the alleged violations of § 727(a)(2) and (a)(3), the Court observes that these sections only mandate that the Plaintiff prove by clear and convincing evidence that the Debtor has violated these provisions. Therefore, in reality, the Debtor is not obligated to rebut the evidence presented and can still survive a § 727 attack. *Chittenden Trust Co. v. Mayo (In re Mayo)*, 94 B.R. 315, 323 (Bankr.D.Vt. 1988). The Third Circuit, in *Matter of Decker*, 595 F.2d 185, 188 (3d Cir.1979), found that the absence of an explanation by the bankrupt was not enough in itself to compel a judge to accept the Plaintiff's undisputed evidence. Instead, the bankruptcy court could determine that the Plaintiff had not carried the burden of proof rather than assuming it had met its initial burden from the absence of contradicting evidence. While, pursuant to § 727(a)(5), this Court concedes that the Debtor is required to explain any loss or deficiency in assets, this stage in the proceeding is reached only after a creditor has presented satisfactory evidence. Notwithstanding G & J Investments' failure to meet its burden, the Court will address whether Debtor has satisfactorily explained any loss of assets.

### 3. § 727(a)(5): Failure to Explain Satisfactorily Any Loss or Deficiency of Assets to Meet Liabilities.

■ On its face, this provision allows a debtor to provide the court with a satisfactory explanation of loss or deficiency of assets at any time "before determination of denial of discharge." *In re Drenckhahn*, 77 B.R. at 697. Here, the initial burden of going forward with enough evidence to demonstrate a substantial loss of assets rests with the objector. Once the objector produces enough evidence to establish the objection, the burden shifts to the debtor. 4 *Collier on Bankruptcy*, Para. 727.08, 727–73 (15th Edition, 1989). Essentially, the debtor must come forward with an explanation of loss or deficiency of assets during the trial and submit that

explanation to the court for its determination as to whether or not it is satisfactory.

The underlying policy promoted by this section is insuring debtors' accountability for past transactions, and to "secure the equitable distribution of the estate among creditors and relieve the honest debtor from oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Nord Resources Corp. v. Walton (Matter of Walton)*, 103 B.R. 151, 155 (Bankr.S.D.Ohio 1989), quoting *National City Bank v. McNamara (In re McNamara)*, 89 B.R. 648, 654 (Bankr.N.D.Ohio 1988) (citation omitted). It does not require or even allow inquiry into the substantive character of the loss or deficiency of assets itself. *Great American Insurance Company v. Nye (In re Nye)*, 64 B.R. 759, 762 (Bankr.E. D.N.C.1986). In fact, § 727(a)(5) does not require that the explanation itself be meritorious, or that the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily describe or account for the disposition. *Id.* As such, the Court's inquiry is limited to whether the debtor has made or now makes an explanation for the loss or deficiency of assets at issue, and whether the explanation is satisfactory. These are questions of fact. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Bell v. Stuerke (In re Stuerke)*, 61 B.R. 623, 626 (Bankr. 9th Cir.1986); *Beloff v. Gallini (In re Gallini)*, 96 B.R. 491 (Bankr.M.D.Pa. 1986).

The notion of a "satisfactory explanation" is not defined in the Code, however, case law indicates to be satisfactory, the explanation must convince the bankruptcy judge. *In re Chalik*, 748 F.2d at 619; *First Texas Savings Assoc., Inc. v. Reed (Matter of Reed)*, 700 F.2d 986, 993 (5th Cir.1983); *Farmers Nat'l. Bank v. Yokley (In re Yokley)*, 61 B.R. 198, 200–01 (Bankr. W.D.Ky.1986). The standard is one of reasonableness and credibility. *Federal Deposit Insurance Co. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr.E.D.

Tenn.1985); *Fox v. Cohen (In re Cohen)*, 47 B.R. 871, 874 (Bankr.S.D.Fla.1985).

The debtor must testify about his losses in a manner which exhibits good faith in the conduct of his financial affairs and in his efforts to make the explanation. *In re Shapiro*, 59 B.R. at 848; *In re Hendren*, 51 B.R. at 788; *In re Cohen*, 47 B.R. at 874; *Slocum v. Wheeler (In re Wheeler)*, 38 B.R. 842, 846 (Bankr.E.D.Tenn. 1984). As with § 727(a)(3), the question of satisfactoriness turns on the nature of the debtor's business, financial affairs, and lifestyle. *Glaser v. Glaser (In re Glaser)*, 49 B.R. 1015, 1020 (S.D.N.Y.1985). The court, again, is given wide discretionary powers to make its determination in view of all the mitigating evidence presented by the debtor. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir.1983); *Mitchell v. Blasini (In re Blasini)*, 67 B.R. 373, 375 (D.P.R.1986); *In re Cohen*, 47 B.R. at 875.

While the debtor must provide the Court with more than mere generalized, vague, and uncorroborated statements in oral testimony, the Code provision does not dictate denial of discharge for failure to produce corroborating papers where the debtor's testimonial assertions bear sufficient credibility. *In re Dolin*, 799 F.2d 251, 253 (6th Cir.1986); *In re Chalik*, 748 F.2d at 619; *In re Martin*, 698 F.2d at 886; *In re Stuerke*, 61 B.R. at 626; *In re Blasini*, 67 B.R. at 375; *DeGase v. DeGase (Matter of DeGase)*, 68 B.R. 504, 510 (Bankr.W.D.Mo.1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Simone (Matter of Simone)*, 68 B.R. 475, 479 (Bankr.W.D.Mo.1983); *In re Yokley*, 61 B.R. at 200–01; *Citizens Fidelity Bank and Trust Co. v. Schermer (In re Schermer)*, 59 B.R. 924, 925 (Bankr.W.D.Ky.1986); *United States Fidelity & Guaranty v. Delancey (In re Delancey)*, 58 B.R. 762, 769 (Bankr.S.D.N.Y.1986); *In re Hendren*, 51 B.R. at 783; *Semmerling Fence & Supply, Inc. v. Ramos (Matter of Ramos)*, 8 B.R. 490, 496 (Bankr.W.D.Wis.1981). *See Federal Deposit Ins. Corp. v. Church (In re Church)*, 47 B.R. 186, 192 (Bankr.E.D. Tenn.1985). However, the debtor must be

prepared to "provide sufficient written financial information to permit creditors to follow the debtor's business transactions, make intelligent inquiry and ascertain the debtor's present and past financial condition. Failure to provide such information without a showing of circumstances warranting excusal will result in the denial of the debtor's discharge." *Matter of Walton*, 103 B.R. at 151; *Bowie v. Bowie (In re Bowie)*, 80 B.R. 99 (Bankr.N.D.Ohio 1987) (citation omitted).

■ As the Court has previously addressed many of the factors within the purview of § 727(a)(5), and in attempting to avoid redundancy, the Court will be brief in its assessment of this alleged violation. The Plaintiff's contention under § 727(a)(5) rests on the Debtor's alleged failure to account for or to be forthcoming with information relating to all aspects of the business enterprise, including the business records. The Court, contrary to the Plaintiff's assertions, found the Debtor willing to explain the business operation and provide the Court with as much information as she, herself, possessed. The Debtor was exceedingly honest and straightforward in her testimony. As such, the Court finds the Debtor satisfactorily explained all issues brought into contention by the Plaintiff.

■ As noted, § 727(a)(5) does not direct the Court inquire into the merits of the Debtor's explanation. But, even if this were the procedure, the Plaintiff has not come forward with any evidence—or even any relative legal argument—to challenge the adequacy of the Debtor's explanation. Given the Plaintiff's failure to rebut, the Court feels that this is an additional ground to conclude that the Debtor's explanations are satisfactory. *In re Wheeler*, 38 B.R. at 846–47. As such, the Debtor is entitled to judgment in her favor on the Plaintiff's count under § 727(a)(5).

As a final matter, the Court finds it appropriate to comment on the demeanor of the witnesses testifying on behalf of the Plaintiff. The bankruptcy court, as a trial court, has considerable experience in assessing the demeanor and credibility of witnesses. *See Staats v. Beckman (In re Beckman)*, 104 B.R. 866 (Bankr.S.D.Ohio 1989); *Ohio Savings Bank v. Larson (In re Larson)*, 103 B.R. 160 (Bankr.S.D.Ohio 1989). *See generally, Mounts v. Greve (In re Greve)*, 97 B.R. 383 (Bankr.S.D.Ohio 1989); *In re Zurface*, 95 B.R. 527 (Bankr.S.D.Ohio 1989). It is mindful of the fact that most of the witnesses testifying against the Debtor were terminated by the Debtor or released from their employment under questionable circumstances. As such, the Court believes this factor may have, unintentionally, colored their testimony. In this case, Plaintiff's witnesses' testimony, generally speaking, was not probative, reliable or consistent. Viewed individually or as a whole, the testimony, at best, created unsupported inferences of improper conduct. However, when viewed in light of Debtor's testimony and the totality of the circumstances, it is clear that Debtor's testimony was credible and that it exculpated her from the misdeeds alleged by Plaintiff. Plaintiff has not met its burden by clear and convincing evidence, nor by a preponderance of the evidence standard, and clearly is not entitled to the relief requested.

While the Court has sympathy for the Debtor, who appeared at trial unrepresented by counsel and who read the complaint against her for the first time immediately preceding the trial, the Court is bound by the Sixth Circuit's decision in *Burden v. Evansville Materials, Inc.*, 840 F.2d 343 (6th Cir.1988). The *Burden* court concluded that when a person chooses to represent himself, he should expect no special treatment which prefers him over others who are represented by attorneys. *Id.* at 363. The application of law must be equal, even for those who appear without the assistance of an attorney. *Wolfel v. United States*, 711 F.2d 66, 67 (6th Cir. 1983). Accordingly, the Debtor was not treated in a more favorable manner than the opposing party with attorneys of record.

Based upon the foregoing, the Court denies the Plaintiff's objections raised in Plaintiff's complaint pursuant to

§ 727(a)(2), (3) and (5), and hereby enters judgment in favor of the Defendant/Debtor.

IT IS SO ORDERED.